352 So.2d 964 (1977)
SOUTH CENTRAL BELL TELEPHONE CO.
v.
LOUISIANA PUBLIC SERVICE COMMISSION.
No. 59705.
Supreme Court of Louisiana.
November 3, 1977.
Rehearing Denied December 14, 1977.
*966 Norman C. Frost, M. Robert Sutherland, Ronald W. Tweedel, New Orleans, Victor A. Sachse, Jr., Victor A. Sachse, III, Breazeale, Sachse & Wilson, Baton Rouge, for plaintiff-appellant.
Jeff McHugh David, Gen. Counsel, Saul Stone, Michael R. Fontham, Stone, Pigman, Walther, Wittmann & Hutchinson, New Orleans, for defendant-appellee.
DENNIS, Justice.
The ultimate issue in this case concerns the reasonableness of a rate order issued by the Louisiana Public Service Commission denying a rate increase requested by South Central Bell Telephone Company. 15 P.U. R.4th 87 (1976). On appeal to the district court for review of the order pursuant to La.R.S. 45:1192, the court, after remanding to the Commission for further determinations, reversed the order of the Commission in part and entered judgment granting the utility a rate increase. The case is here on appeals from the district court judgment by both the Company and the Commission. La.Const. art. 4, § 21.
South Central Bell, a Delaware corporation, is one of twenty-four operating companies included in the Bell System of the American Telephone & Telegraph Company. All of South Central Bell's outstanding capital stock is owned by A. T. & T. The Bell System includes Bell Telephone Laboratories, Inc., and Western Electric Company. The former performs research, development and design work, and the latter manufactures, purchases, repairs, and distributes apparatus, equipment and supplies, and installs central office equipment for the Bell System. Under license contracts, Bell System Laboratories provides services for the operating companies and the long lines department of A. T. &. T.
South Central Bell serves customers in Louisiana, Alabama, Kentucky, Mississippi and Tennessee. Its service covers both intrastate and interstate calls.
South Central Bell applied to the Louisiana Public Service Commission on April 18, 1975 for a rate increase sufficient to produce additional intrastate revenues of $73,000,000 annually in Louisiana. The application was based on a forecasted test year ending June 30, 1976. In November of 1975, the application was amended to base the requested increase on a new test year ending December 31, 1976 and to elevate the requested increase so as to produce an additional $16,000,000 in revenues for a total of $89,000,000 annually.
On June 18, 1976 the Commission issued an order denying South Central Bell's application for a rate increase.[1] The Company *967 appealed, and after proceedings were held, the district court rendered a written opinion finding that the Commission had erred in its treatment of research and development costs and in failing to grant the Company an attrition allowance. The case was remanded to the Commission for a period of forty-five days for the purpose of amending the order to conform with the views expressed by the court and for further proceedings in this connection. The Commission determined that under the court's opinion and judgment an increase would be required in intrastate rates sufficient to produce revenues of $6,714,000 for an attrition allowance and $1,728,000 for reversal of the Commission's research and development cost adjustment. In order to preserve its right to appeal the court's ruling the Commission did not amend its order but merely reported its findings to the district court. After further judicial review, the district court concluded that the attrition allowance determined by the Commission was inadequate and amended the order of the Commission to grant a rate increase to South Central Bell sufficient to produce $26,320,000 in additional intrastate revenues. Both South Central Bell and the Commission appealed to this Court.

Elements of Rate-Making
The primary purpose of the ratemaking process is to set rates at such a level that the utility's revenue will be sufficient to permit the utility both to pay its legitimate operating expenses and to provide a return on investment adequate to compensate existing investors and attract new capital as it is required. See, Jones, Judicial Determination of Public Utility Rates: A Critique, 54 B.U.L.Rev. 873, 875 (1975) [hereinafter referred to as Jones]. When this level is achieved the utility's revenues produce a "fair rate of return." The legal standard for determining a fair rate of return was articulated in two well known cases: Federal Power Commission v. Hope Natural Gas Co., 320 U.S. 591, 602, 64 S.Ct. 281, 88 L.Ed. 333 (1944); Bluefield Waterworks & Improvement Co. v. Public Service Commission, 262 U.S. 679, 692-93, 43 S.Ct. 675, 67 L.Ed. 1176 (1923). In Federal Power Commission v. Hope Natural Gas Co., supra, the Supreme Court observed:
"Rates which enable the company to operate successfully, to maintain its financial integrity, to attract capital, and to compensate its investors for the risks assumed certainly cannot be condemned as invalid. * * *" Id. 320 U.S. at 605, 64 S.Ct. at 289.
Once the regulatory agency has determined the amount of annual revenue required by the utility to produce a fair rate of return the agency will consider the question of rate design: that is, the rates each class of consumers should pay in order to produce the annual revenues required for a fair rate of return. In the instant case we are not concerned with rate design, but our basic concern is whether the annual revenue requirement of the utility was fairly and reasonably determined by the public service commission.
The general approach of a regulatory agency in determining whether an existing rate structure is producing inadequate or excessive revenues is well established. The agency first selects a "test year," normally the most recent annual period for which complete financial data are available, and calculates the utility's revenues, expenses and investments during the test period. The utility's revenues minus its expenses, exclusive of interest, constitute the earnings or the "return" that is available to be distributed to the utility's stockholder and creditor investors. The total amount of investment in a utility employed in providing its service, the utility's rate base, is determined by adding the investment in *968 physical properties to an allowance for working capital. The agency then decides whether the actual "rate of return," the ratio of return to rate base, is deficient, adequate or excessive. Jones, supra, at 876. See also, J. Bonbright, Principles of Public Utility Rates, 147-283 (1961) [hereinafter referred to as Bonbright]; 1 A. Priest, Principles of Public Utility Regulation, 45-226 (1969) [hereinafter referred to as Priest].
For example, if a utility's rate base during the test year was $100,000,000 its test-year revenues $35,000,000, and its test-year expenses, exclusive of interest, were $28,000,000, then the utility's return would be $7,000,000 and its rate of return would be seven per cent. If the fair rate of return is six per cent, a rate reduction would be appropriate. If seven per cent is fair, no rate change would be required. If eight per cent is the fair rate of return, a rate increase would be justified. See Jones, supra, at 876.
The final calculations involved in determining the utility's revenue requirement, as thus summarized, are relatively simple. However, to arrive at the ultimate figures used in these calculations requires extensive examination of the utility's operations and frequent exercise of informed judgment. Every aspect of the utility's operations during the test year must be examined in order to determine the extent to which the figures it has received from the utility are representative of the figures that will, or should, prevail in the future. Ideally, the agency should conduct an audit to insure that the utility's books accurately describe the revenues, expenses and investment and that proper accounting procedures have been followed. The auditing may lead the agency to question whether particular expenditures or investments are properly chargeable to utility operations, whether capital expenditures have been improperly charged to operating expenses or operating expenses improperly capitalized, whether accruals for reserves have been made at appropriate levels, and whether any expenses incurred during the test year are properly chargeable to some other period of time. If the rate making agency determines that any such matter has been improperly treated from a regulatory standpoint, appropriate adjustments must be made to the operating results. As we shall see, two of the contested issues in the instant case involve whether the public service commission acted reasonably in adjusting the utility's treatment of particular investment, expense or revenue items.

Principles of Judicial Review
In reviewing the rate making process the inquiry of the judiciary is generally confined to a determination of whether the regulatory agency acted unreasonably or arbitrarily in establishing rates for the utility. Priest, supra, at 436. The United States Supreme Court, in assessing the Federal Power Commission's performance of its statutory duty to fix "just and reasonable" rates, elaborated on this principle:
"* * * If the total effect of the rate order cannot be said to be unjust and unreasonable, judicial inquiry under the Act is at an end. The fact that the method employed to reach that result may contain infirmities is not then important. Moreover, the Commission's order does not become suspect by reason of the fact that it is challenged. It is the product of expert judgment which carries a presumption of validity. And he who would upset the rate order under the Act carries the heavy burden of making a convincing showing that it is invalid because it is unjust and unreasonable in its consequences. * * *" Id. 320 U.S. at 602, 64 S.Ct. at 288.
The Louisiana Public Service Commission is authorized to fix "just and reasonable" rates to be charged by public utilities. La. R.S. 45:1176. In Louisiana rate cases this Court has articulated various descriptions of its role in reviewing the regulatory determinations of the public service commission. We have said the orders of the Commission are entitled to great weight and are not to be overturned unless shown to be arbitrary, capricious or abusive of its authority; Louisiana Oilfield Carriers Association, *969 Inc. v. Louisiana Public Service Commission, 281 So.2d 698 (La.1973); Louisiana Tank Truck Carriers, Inc. v. Louisiana Public Service Commission, 244 La. 909, 155 So.2d 15 (1963); Louisiana Power & Light Co. v. Louisiana Public Service Commission, 256 La. 656, 237 So.2d 673 (1970); that courts should act slowly in substituting their views for those of the expert body charged with the legislative function of rate making, and should not disturb the Commission's decision in the absence of a clear showing of an abuse of power; Greater Livingston Water Co. v. Louisiana Public Service Commission, 294 So.2d 501 (La. 1974); United Gas Pipe Line Co. v. Louisiana Public Service Commission, 241 La. 687, 130 So.2d 652 (1961); Gulf States Utilities Co. v. Louisiana Public Service Commission, 222 La. 132, 62 So.2d 250 (1952); Illinois Central R. Co. v. Louisiana Public Service Commission, 224 La. 279, 69 So.2d 43 (1953); Southern Bell Telephone & Telegraph Co. v. Louisiana Public Service Commission, 232 La. 446, 94 So.2d 431 (1957); Southern Bell Telephone & Telegraph Co. v. Louisiana Public Service Commission, 239 La. 175, 118 So.2d 372 (1960); that Commission decisions will not be disturbed unless found to be clearly erroneous or unsupported by evidence. White v. Louisiana Public Service Commission, 259 La. 363, 250 So.2d 368 (1971); Monochem, Inc. v. Louisiana Public Service Commission, 253 La. 1047, 221 So.2d 504 (1969); Arkansas & Louisiana Missouri Railway Co. v. Louisiana Public Service Commission, 251 La. 963, 207 So.2d 760 (1968); Texas & Pacific Railway Co. v. Louisiana Public Service Commission, 240 La. 669, 124 So.2d 902 (1960).

The Commission's Determinations
The Public Service Commission used the generally accepted approach in determining whether South Central Bell's application for a rate increase and additional revenues has merit. The Commission selected the calendar year of 1975 as the test year. After considering thousands of pages of testimony, exhibits, tables, cross-examination, data requests, and data responses the Commission made its determinations. It found that during the test year the utility had revenues of $72,017,000, an average rate base of $828,280,000 and an actual rate of return of 8.7%. Because the Commission had previously determined that a rate of return of 8.55% to 9.01% would be a fair rate of return for South Central Bell, it concluded that no rate change was warranted because the actual rate of return earned during the test year was within this range. We will discuss later the method used by the Commission to determine that the fair rate of return was 8.55% to 9.01%.
In arriving at the figures it used to make the final calculation of the actual rate of return, the Commission made a series of adjustments to the data furnished by South Central Bell from its books. Adjustments to the rate base included reductions to account for overstatement of materials and supplies paid for, overstatement of federal income taxes paid, sums advanced by customers, accumulated deferred income taxes and unamortized tax credits, and overstatement of intrastate plant. Among the Commission's adjustments to revenues and expenses was a requirement that research and development costs be capitalized rather than treated as a current expense, flow through of deferred state income taxes, reduction of test year income tax expense, and reduction of overstated intrastate operations expenses.
Two of the Commission's adjustments are subjects of dispute in this Court. The other questions presented by the appeals concern the Commission's calculation of the rate of return and its failure to increase the utility's required revenues to offset attrition of the rate of return.
The Commission contends that the district court erred in reversing its adjustment of research and development costs and in ordering a rate increase to offset attrition. South Central Bell argues that the district court erred in affirming the Commission's findings that the appropriate capital structure for rate making purposes is the Bell System capital structure; that the proper cost of debt is that of the Bell System; that the proper cost of equity is 10.5-11.5%; *970 that the Commission's separations of interstate plant and expenses from intrastate rate base and expenses were proper. South Central Bell also contends that the increase in rates to offset attrition is inadequate and should be increased to allow an additional $21,000,000-$26,000,000 in annual revenues over the amount awarded by the district court.

Fair Rate of Return
The generally accepted method of computing the fair rate of return is the "cost of capital" approach. For purposes of explanation, we will assume a small utility corporation, providing only intrastate service within one state, and not affiliated with other enterprises.[2] The rate making authority examines the utility's capital structure to identify the sources of the utility's capital. The utility might have a capital structure consisting of fifty per cent debt, fifteen per cent preferred stock and thirty-five per cent common stock. The regulatory agency then ascertains the cost of each component: the cost of debt, determined essentially by the annual interest requirements of the utility's bonds, could be six per cent; the cost of preferred stock, governed basically by the stated dividend requirement on such stock, might be eight per cent; the cost of common stock, determined by the return required to sell such stock on reasonable terms in the market, may be twelve per cent. Using these preliminary computations, the overall cost of capital may be calculated as follows:

Debt 50% at 6% = .030
Preferred Stock 15% at 8% = .012
Common Stock 35% at 12% = .042
 ____
 .084

The fair rate of return is essentially the same as the overall cost of capital. Sometimes regulatory agencies will adjust this percentage figure to take account of imperfections in the resolution of preliminary issues. For example, dispute often arises in connection with three preparatory determinations. First, if the existing capital structure is inappropriate for the utility, its cost of capital may be excessive or inadequate due to lack of proper proportion between its debt and common stock. Second, because common stock does not bear a fixed return, its valuation is the subject of a number of varied, highly complex approaches, often yielding differing results. Third, there may be need in some cases to add an increment to the overall rate of return to allow for contingencies or for imprecision; to offset for anticipated inflation; to provide incentive or recognition for good performance. Priest, supra, at 47-51; Jones, supra, at 882.
In the instant case the Commission utilized the capital structure of the Bell System, consisting of 49.5% debt, 4.4% preferred stock and 46.1% common stock, in computing the fair rate of return. The regulatory agency further determined the cost of debt to be 6.8%, the cost of preferred stock, 7.8%, and the cost of common stock or equity, 10.5% to 11.5%. Using these figures it calculated the fair rate of return as follows:

Debt 49.5% at 6.8% = 3.37%
Preferred 4.4% at 7.8% = .34%
Common 46.1% at 10.5-11.5% = 4.84% to 5.30%
 ______________
Fair Rate of Return 8.55% to 9.01%

South Central Bell contends that the fair rate of return calculated by the Commission is too low because the agency used the Bell System capital structure rather than South Central Bell's actual capital structure and because it improperly computed the cost of debt and cost of equity. A considerably higher fair rate of return would have resulted if the Commission had used South *971 Central Bell's figures in calculating the percentage as follows:

Debt 45% at 7.61% = 3.42%
Equity 55% at 13% to 15% = 7.15% to 8.25%
 ________________
Fair Rate of Return 10.57% to 11.67%

Capital Structure
South Central Bell contends that only its own capital structure, consisting of 45% debt and 55% equity, should have been considered by the Commission in its determination of the fair rate of return, rather than the entire Bell System capital structure. The cost of equity capital is higher than the cost of debt capital, both generally and for the Bell System. Since the capital structure of South Central Bell contained a greater percentage of equity capital than the Bell System structure, a fair rate of return based on South Central Bell's structure alone would have been higher.
The opinions of other regulatory agencies and scholars indicate that in calculating the cost of capital of a wholly owned subsidiary, such as South Central Bell, valid reasons may be given for employing the capital structure of either the subsidiary or its parent corporation. Use of the latter has been criticized on grounds that it fails to recognize that each subsidiary is regulated by a different agency and may experience significantly different operating and financial risks. See, Fitzpatrick, Subsidiaries' Capital CostsA Compromise Approach, 99 Public Utilities Fortnightly, No. 13, p. 23 (1977); cf. Re Southwestern Bell Telephone Co., 10 P.U.R.4th 323, 329 (Ark.1975). The great weight of expert regulatory bodies, nevertheless, favors use of the parent's capital structure for several reasons. The subsidiary is an integral part of a corporate system, its risks are indistinguishable from those of the system, and, in the case of South Central Bell, its cost of equity is determined solely by Bell System management and investors since it issues stock only to the parent corporation. See, Re Southern Bell Telephone & Telegraph Co., 10 P.U.R.4th 166 (S.Car.1975); Re The Chesapeake & Potomac Telephone Co., 10 P.U. R.4th 211 (Md.1975); Re Southern Bell Telephone & Telegraph Co., 8 P.U.R.4th 188 (Ga.1974); Re Southwestern Bell Telephone Co., 98 P.U.R.3d 30 (Kan.1973); Re Southern Bell Telephone & Telegraph Co., 83 P.U.R.3d 84 (Fla.1970); Cf. Re Southern Bell Telephone & Telegraph Co., 12 P.U. R.4th 252 (Fla.1975); Re New York Telephone Co., 12 P.U.R.4th 1 (N.Y.1975). Moreover, it has been argued that determination of a subsidiary's cost of capital based on its own merits ignores the fact that the parent company can elect to create an "artificial" capital structure in the sense that it could not be supported efficiently in the market in the absence of financial support by the parent company. Fitzpatrick, Id. at 25.
Both the Commission and the utility contend that the testimony of South Central Bell's expert witnesses supports their respective positions on the capital structure issue. From our reading of the record it appears that the witnesses were not interrogated directly on the question of the proper capital structure for determining cost of equity. Nevertheless, the tenor of their testimony as well as some of the assumptions upon which it appears to have been based supports a reasonable inference that use of the Bell System capital structure is justified. Each witness' testimony dealt almost entirely with the Bell System and its cost of equity capital, and each of the witnesses recommended a rate of return on equity capital for South Central Bell which exactly coincided with the requisite return on equity capital he derived for A. T. & T. However, no independent explanation was given of how the figures for South Central Bell were determined. It was apparent from their testimony that the South Central Bell experts viewed the Bell System as a whole and did not treat South Central Bell as a separate entity. They merely adopted for South Central Bell the same cost of equity capital which they concluded investors in the open market would assign to Bell System capital issues.
Alternatively, South Central Bell argues, if use of the Bell System capital structure is not intrinsically unreasonable, the Commission was arbitrary because it departed from a long practice of using a hypothetical 45% debt, 55% equity ratio *972 which had been approved in the past by this Court. The Commission initiated the practice in 1956 because it found that the Company's actual debt ratio of 22.3% in 1955 was disproportionately low. We affirmed and found reasonable the Commission's determination that, because of the relatively higher cost of equity capital, it would be unfair to require ratepayers to support the Company's actual capital structure with its disproportionably high 74.6% ratio of common stock. Southern Bell Telephone & Telegraph Co. v. Louisiana Public Service Commission, 232 La. 446, 94 So.2d 431 (1957); Cf. Southern Bell Telephone & Telegraph Co. v. Louisiana Public Service Commission, 239 La. 175, 118 So.2d 372 (1960). However, it does not follow that this is the only reasonable capital structure that can ever be used in determining the utility's cost of capital. Past practices should not prevent a regulatory agency from adopting in good faith new approaches and techniques in an effort to more realistically determine a rate of return fair to both the utility and the ratepayers. Perhaps several frequent changes or a new approach adopted under different circumstances would indicate capriciousness or bad faith. The instant case, however, presents the Commission's first actual change in this respect in twenty years. One previous attempt to use a different capital structure was nullified by the district court, but no appeal was taken to this Court. South Central Bell Telephone Company v. Louisiana Public Service Commission, 90 P.U.R.3d 69 (La.1971). For this reason, and also because there is no evidence that the Commission acted in bad faith, we cannot say that the decision to depart from its past practice in order to consider the capital structure of the Bell System was unreasonable.
Accordingly, we conclude that the Commission did not act arbitrarily or in abuse of its discretion by departing from its past practice or by adopting the capital structure of the Bell System for purposes of rate making because its decision is supported by the weight of regulatory authorities, its own expertise and reasonable inferences drawn from the testimony of the expert witnesses.

Cost of Debt and Preferred Stock
The determination of cost of debt and preferred stock usually does not involve complexities. Bonds and preferred stock carry a fixed yield provided by contract which can be readily ascertained. This is true in the instant case, but the parties disagree as to the proper source of the yield data.
Having determined that the Bell System capital structure should be used for regulatory purposes, the Commission concluded that it would be appropriate and consistent to use the Bell System cost of debt and cost of preferred stock in deriving the fair rate of return. 15 P.U.R. 4th 87, 123. The agency's use of these cost rates, i. e., 6.8% as the cost of debt and 7.8% as the cost of preferred stock, was upheld by the district court.
On appeal in this Court the utility contends the commission should have used the South Central Bell cost of debt of 7.61% because it has issued bonds to outsiders who are independent of the parent corporation. The company relies on New England Telephone and Telegraph Company v. Department of Public Utilities, 360 Mass. 443, 275 N.E.2d 493 (1971) in which the court held that, where a subsidiary utility corporation raises debt capital from sources independent of its parent corporation, the subsidiary's historic cost of capital should be used. Additionally, South Central Bell argues that the cost of debt adopted by the Commission will deprive its equity owners of the opportunity to earn a fair return and jeopardize its AAA bond rating.
The Commission, on the other hand, contends that its determination was warranted for a number of reasons: South Central Bell's obligation to pay a relatively high average yield, 7.61%, results from its imprudent failure to issue more debt, instead of equity, in earlier years when debt capital was less expensive, and ratepayers should not bear the burden of a utility's imprudence. Since South Central Bell is wholly owned by A. T. & T., it is appropriate to *973 evaluate equity and debt costs with reference to the Bell System financial structure. The Company's argument lacks credibility because its own witnesses in other cases have based their testimony on the debt costs of the Bell System. See, Re The Chesapeake & Potomac Telephone Co. of Maryland, 10 P.U.R.4th 211, 218 (Md.1975); Re Southern Bell Telephone & Telegraph Company, 10 P.U.R.4th 166 (S.Car.1975). The Massachusetts high court's holding in the New England Telephone & Telegraph case, supra, is inapposite because that case did not involve a wholly owned subsidiary, and use of the Massachusetts utility's actual cost of debt was justifiable as a means of protecting members of the public who owned a 29% minority share of the company's stock.
South Central Bell's arguments are plausible but not irrefutable. The Commission's position may have infirmities but it is likewise reasonable and meritorious. When confronted with the same question, the Florida Public Service Commission concluded that use of the subsidiary's cost of debt would be improper because the regulatory agency had decided to utilize the parent corporation's capital structure in its determinations. Re Southern Bell Telephone and Telegraph Company, 83 P.U.R.3d 84 (Fla.1970). In a similar case involving a different utility, this Court approved the Commission's use of the parent company's cost of debt in regulating its subsidiary utility corporation. United Gas Pipe Line Co. v. Louisiana Public Service Commission, 241 La. 687, 130 So.2d 652 (1961). There, we said:
"The cost of debt capital has a contractual basis. While it is possible to determine the cost of this to [the subsidiary], we agree with the Commission that in view of the intercorporate relationship the most reliable means of determining the historical cost of debt is to look to [the parent corporation]. It is well established that, in making a determination of costs for rate purposes, the reviewing Commission may look through the corporate form of affiliated corporations and probe for economic realities." 130 So.2d at 660.
The Commission is not required to accept uncritically for regulatory purposes the utility's corporate form or financial information. It is the agency's duty to look beyond superficialities for economic reality. Accordingly, the regulatory body was not obliged to treat South Central Bell as a free standing utility rather than a wholly owned subsidiary of A. T. & T., or as a corporation whose capital structure, cost of equity and cost of debt have been determined entirely by its own management and investors in the open market. By the same token, it was not unreasonable for the Commission to consider whether the utility's historical debt issuance policy had been unfair to the ratepayers.
Because South Central Bell is wholly owned by A. T. & T., the parent company in the final analysis is responsible for the utility's capital structure and the quality of its capital debt. The Commission's decision to look through the corporate form and use the parent company's cost of debt was reasonable. The Court's function is to review the Commission's action for reasonableness, not to decide which party's theory is better or to substitute its judgment. The Commission's determination of this issue was correctly upheld by the district court.

Cost of Equity
The cost of equity or risk capital is more difficult to evaluate than fixed charge capital. Equity capital does not always pay dividends; all profits after fixed charges accrue to it and it must withstand all losses. The cost of such capital cannot be read or computed directly from the company's books. Its determination involves a judgment of what return on equity is necessary to enable the utility to attract enough equity capital to satisfy its service obligations. Conclusions arrived at by regulatory bodies, utilities and their experts vary engagingly. Priest, supra, at 209.
Since the equity capital of South Central Bell is derived entirely from investments by its parent company, A. T. & T., both the *974 utility's experts and the Commission based their opinions primarily upon their respective judgments of the Bell System's current cost of equity. While the Commission used A. T. & T.'s past stock issues and earnings records as a premise for its evaluation, the methods employed by the company's experts relied upon current but more subjective data. The parties agree that the cost of equity capital should be high enough to enable a corporation to issue stock at book value or above.
Return on equity is that portion of the utility's return available for distribution to equity owners after payment of fixed capital charges. The Commission found that A. T. & T. has not historically required a return of over 10.5% on equity to attract equity capital. It noted that in 1976 the parent company marketed 12,000,000 new common shares at a gross price in excess of book value after the equity earnings in 1975 had been only 9.8%. Based upon its analysis and review of the record presented in the case, including all of the evidence of South Central Bell, and after allowing for a margin of safety, the Commission concluded that the appropriate cost of equity was in the range of 10.5% to 11.5%.
The Commission expressly rejected the opinions of the Company's expert witnesses who testified that the cost of equity was in the range of 13% to 15%. Their estimates were based upon three different sources, viz., a comparative earnings test, a correlation of other companies' earnings on book equity with bond yields, and opinions of institutional investors. In its opinion the regulatory body discussed and criticized each witness' method of evaluation. It was not established to the agency's satisfaction that the corporations whose earnings were compared presented investment risks comparable to that of A. T. & T. or South Central Bell, or that the returns actually earned by the compared companies were reasonable. The estimation of cost of equity by correlation with bond yields was rejected because it was based on the faulty premise that the rate earned on book equity is always equal to the cost of equity. The opinion of the witness who based his opinion on his conversations with institutional investors, who were his clients, was rejected as being founded on an unreliable and speculative basis. The Commission concluded that the high rates of return recommended by the South Central Bell witnesses were attributable in large measure to the unusual impact of the recession.
The district court held that the figure arrived at by the Commission, although conservative, was within the bounds of discretion accorded to that body. In making this determination the district judge compared the earnings of several companies to arrive at what he considered an average rate of return on equity. The result of this calculation was 11.73%, which falls between the Commission's 10.5%11.5% cost of equity and the 13%15% range recommended by the company witnesses. Based on this comparison, the district court concluded the Commission's determination was reasonable.
In this Court, South Central Bell urges the merits of its witnesses' opinions and attacks the Commission's determination on various grounds. The company contends that the agency's reliance on A. T. & T.'s 9.8% rate of earnings on book equity in 1975 was misplaced because the investors who paid over book value for Bell System stock in 1976 were expectant of a return of much more due to their awareness of an earlier 1976 F. C. C. determination that A. T. & T. needed to earn 12%-13% on equity. According to the utility the Commission failed to recognize that inflation causes investors to demand a higher rate of return and that the recent introduction of more competition into some facets of the telephone industry warrants a comparison of A. T. & T. with higher risk companies having higher costs of equity. Moreover, the company contends, the cost of equity established by the Commission is discriminatory when a comparison is made with other utility companies as this Court did in Southern Bell Telephone & Telegraph Company v. Louisiana Public Service Commission, 239 La. 175, 118 So.2d 372 (1960).
*975 In reply, the Commission asserts that the opportunity to earn a 12%13% return on equity allowed A. T. & T. by the F. C. C. on interstate operations indicates that a lower return is warranted on South Central Bell's intrastate operations. The F. C. C. approved return reflects risks inherent in A. T. & T.'s interstate operations which do not confront South Central Bell in its intrastate operations, viz., risks caused by newly sanctioned competition in the interstate telephone industry and risks inherent in the deferment of collection for interstate calls until after the service has been rendered. The utility's comparison of other corporations' cost of equity is invalid, according to the Commission, because the sample of corporations used were non-Bell System companies subject to higher risk factors than A. T. & T. or South Central Bell.
We agree with the district court that the determination of the Commission was not arbitrary, unreasonable or deserving of judicial intervention. The comparison made by the district court of the utility's earnings with that of other companies tends to show that the Commission's cost of equity determination was not discriminatory. When compared with the cost of equity of A. T. & T. the allowance here is adequate. Testimony by one of the utility's own expert witnesses indicated that during the 1975 test year A. T. & T. stock sold above gross book value while the parent company's return on equity was approximately 9.8%. This data was recent and probative evidence providing an adequate basis for the regulatory body's finding that South Central Bell needed a 10.5% to 11.5% return on equity to attract equity capital at book value or above. The evidence of regulatory abuse of discretion underlying the company's arguments was simply not substantial enough to show that the Commission's divergent view was arbitrary or capricious. Perhaps the expert testimony and evidence presented by the utility would have supported a different approach and conclusion by the Commission, but the Commission's method of determining cost of equity was equally valid and supported by the record.

Attrition
Attrition is a decline in a utility's actual rate of return, after the test year, caused by a growth in its rate base or operating expenses, or both, which outstrips any increase in its revenues. As long as revenues increase in the same proportion as rate base and expenses, the rate of return will remain constant. If revenues lag in rate of growth, however, attrition occurs and the utility's actual rate of return falls below the level which the rates fixed by the regulatory agency were designed to produce.
In order to illustrate the dynamics of attrition, the Commission used the following examples in its second rate order:
Assume in the test year that:

Revenues = $1,000
Expenses = $ 800
Net Operating Income = $ 200
Rate Base = $2,500
Realized Rate of Return = 8%

Assume further that 8% is the fair rate of return and as a further simplification that there are no income taxes. If revenues, expenses and rate base each grew at the same rate, say 6%, the following result is obtained:

 Test Following
 Year Year
 ____ _________
Revenues $1,000 × 1.06 = $1,060
Expenses $ 800 × 1.06 = $ 848
Net Operating
 Income $ 200 Rev. Exp. = $ 212
Rate Base $2,500 × 1.06 = $2,650
Realized Rate
 of Return 8% (NOI divided by
 rate base) = 8%

Thus, under these assumed facts there will be no attrition. Now assume that revenues grow by 6% but that expenses and rate base grow by 8%. In that situation the following would result:

 Test Following
 Year Year
 ____ _________
Revenues $1,000 × 1.06 = $ 1,060
Expenses $ 800 × 1.08 = $ 864
Net Operating
 Income $ 200 Rev.-Exp. = $ 196
Rate Base $2,500 × 1.08 = $ 2,700
Realized Rate
 of Return 8% (NOI divided by
 rate base) = 7.26%
 Annual Rate of
 Attrition = .74%

Thus, based on this assumed set of facts, test year rates would produce an 8% rate of *976 return in the test year, but would produce only 7.26% in the following year. The accrued rate of attrition is .74%.
One final example will show the result where the components grow at different rates and yet produce no attrition:

 Test Following
 Year Year
 ____ _________
Revenues $1,000 × 1.084 = $1,084
Expenses $ 800 × 1.09 = $ 872
Net Operating
 Income $ 200 Rev.-Exp. = $ 212
Rate Base $2,500 × 1.06 = $2,650
Realized Rate
 of Return 8% = 8%

It can be seen that even though expenses are growing faster than revenues (9% versus 8.4%) the rate base is growing at a rate sufficiently less than revenues (6% versus 8.40%) to completely offset the effect of the expense growth. See, Ex Parte Application of South Central Bell Telephone Company, Order No. U-12785A, pp. 10-11 (La.Pub. Serv.Comm.1977).
Accordingly, attrition is not simply the result of growth or inflation, but is caused by particular forms of increases which produce a distortion in the test year relationship between the utility's revenues and its rate base or its expenses, or both.
Although South Central Bell presented evidence that attrition would occur in 1976, the year following the test year, the Commission did not grant any allowance to offset attrition and did not expressly address the issue in its first opinion rendered on June 28, 1976 explaining its rate order of June 15, 1976.
On appeal the district court found that the Commission's failure to consider an adjustment for attrition was unreasonable because it ignored several economic realities. First, the court found that the Commission had improperly disallowed the treatment of research and development costs as current expenses. When these costs were included in expenses, the court found that the Company's actual earned rate of return in the test year was only 8.59% instead of 8.7% as determined by the Commission. Second, the district court found that the Commission did not consider factors reasonably anticipated to affect the rate of return, such as inflation. Third, the court's study of decisions by other regulatory agencies revealed precedents for making attrition adjustments or allowances. See, e. g., Re The Mountain States Telephone & Telegraph Co., 8 P.U.R.4th 547 (Ariz.1975); Re The Chesapeake & Potomac Telephone Co. of Va., 10 P.U.R.4th 255 (Va.1975); Re New York Telephone Co., 12 P.U.R.4th 1 (N.Y. 1975); Re Southern Bell Telephone & Telegraph Co., 12 P.U.R.4th 252 (Fla.1975).
In its opinion of January 4, 1977 the district court stated that "the Commission should make an evaluation based upon the known inflation rate and make an adjustment to the rate of return such as other Commissions have done in order that a fair rate of return may be secured." It declined, however, to dictate how the adjustment should be made. The opinion indicated the case would be remanded to permit the Commission to correct its order by making an allowance to offset attrition and an adjustment to treat research and development costs as current expenses. However, in its final judgment of January 6, 1977, the case was remanded for the purpose of "receiving evidence and making findings" of the adjustments required by the district court opinion, and the Commission was further ordered to complete its action on the case within forty-five days.
On January 14, 1977 South Central Bell filed with both the district court and the Commission new evidence in support of an attrition allowance consisting of affidavits of three Company witnesses presenting actual and forecasted financial data with anticipated regulatory adjustments. The affidavit of D. M. Ballard, Assistant to the Chief Accountant of South Central Bell, set forth his calculations of the Company's rate of return using data from three different *977 test years, i. e., the 1976 average test year, the 1976 year end period, and the forecasted 1977 average test year. According to Ballard, the calculations included adjustments to the Company's income, expense and rate based items made on the same basis as the Commission's adjustments to the 1975 data, except for the separations adjustments. His computations indicated attrition in the form of a decline from the fair rate of return of 8.55%-9.01% determined by the Commission to an actual rate of return of 7.31% based on the average 1976 data, 7.09% on the 1976 end-of-period data, and 6.08% based on projected 1977 data.
The Commission moved the district court to either amend the January 6, 1977 judgment to make it clear that the consideration of new evidence was not mandatory or to extend the 45-day remand period to one year to permit full analysis of the new evidence. The district judge denied the motion without written reasons but later addressed a letter to counsel for the Commission stating that he had indicated in oral reasons "that the Commission could use its discretion whether it wished to consider the additional evidence filed by South Central Bell following the decision."
On remand the Commission did not use the new evidence filed by South Central Bell on the issue of attrition. The Commission stated that the affidavits of the Company witnesses consisted of "conclusionary" statements and contained none of the underlying data necessary for a proper regulatory analysis. Because of the 45-day time limitation imposed by the district court, the Commission found that a proper regulatory analysis of the new evidence, including numerous data requests, analysis of underlying data, open hearings, examination of witnesses, and presentation of expert witnesses was not possible. Moreover, the new evidence was found to be unnecessary to an attrition adjustment, and the Commission noted that the Company had never before said that the original record was inadequate for the purpose of analyzing attrition. The Commission also relied on the assurances made by the district court that consideration of the new evidence would be discretionary.
In making its examination for attrition the Commission used a detailed study approach in which the relationship between South Central Bell's revenues, expenses and rate base was examined during the past ten years. The Commission found that over the last ten years revenues had grown by 8%, expenses had grown by 9% and depreciation and rate base had grown by 10.5%. Finding that these growth rates reflected the factors of economic conditions and inflation, which the court directed it to consider, the Commission projected an expected annual rate of attrition of .4%. The Commission further determined that a revenue increase of $6,714,000 would be needed to offset this rate of attrition.
In its review of the Commission's findings on remand, the district court found that the Commission's method of adjustment for attrition was very conservative, yet not unreasonable. However, the district court found that the Commission's overall result would not produce a fair rate of return and that a further increase was warranted. Adopting the findings contained in Mr. Ballard's affidavit which pertained to the 1976 average test year, the court ordered that rates be increased to produce an additional $26,320,000 in revenues to offset attrition.
On appeal in this Court South Central Bell contends that the district court erred in approving only part of the increase needed and requests an additional allowance of $21,500,000 to $26,000,000. The Company argues that the amount awarded by the district court only covered 1976 and that a comparable amount should have been awarded to offset the impact of inflation and attrition after the new rates became effective.
The Commission on appeal contends that no allowance for attrition is justified but, in the alternative, if this Court determines *978 that an allowance is warranted, that it should not exceed the amount computed by the Commission. The Commission argues that the district court failed to consider factors which tend to offset attrition, viz., that the return in the test year was sufficient; bond prices have dropped reducing the cost of capital; the Company has enjoyed consistent increases in productivity; the economy is improving and inflation is subsiding. The Commission further argues that no allowance is justified because no adjustments were made for the impact on the cash flow of the Company of deferred income taxes and tax credits. The 1969 Tax Reform Act allows utilities to defer payment of huge amounts of income taxes if they are treated as current expenses for regulatory purposes. The actual tax effect for South Central Bell, according to the Commission, is an indefinite deferral of tax payments which amounts to an average of $8,000,000 per year and an accrued total of $51,000,000 to date. In support of its contentions that the attrition allowance determined by the Commission was adequate, the Commission points out that the allowance raises the return on equity to 11.7%, a figure well within the average range in Bell System decisions.
We find that the Commission erred in its original decision in failing to consider whether attrition would occur in the years following the test year and that the district court correctly remanded for such a consideration. Adjustments are often necessary to take into account conditions that may not be reflected in the test year data. Priest, supra, p. 203, et seq.; Nichols and Welch, Ruling Principles of Utility Regulation (Rate of Return Supplement A) (1964), p. 55, et seq.; Jones, supra, at 879.
The Commission's refusal on remand to adopt the Company's conclusions as to the amount which should be granted to offset attrition was not unreasonable. The Commission as a regulatory body has a duty to analyze a utility's data critically and its decision that this could not be done properly within the thirty-seven days remaining after its receipt of the data was not arbitrary or capricious. Additional time in which to properly verify and scrutinize the information was requested by the Commission but denied by the district court. The Commission was expressly informed by the district court that it should use its judgment as to the consideration of additional evidence. Under these circumstances the Commission's decision to use other methods to determine the amount of attrition, if any, rather than either accepting at face value the Company's conclusions or taking the extensive time necessary to verify new test year data was entirely reasonable.
The Commission's determination of an attrition allowance by use of the detailed study method was also reasonable. Forecasting future industrial, financial and economic trends is fraught with uncertainty, and there is no single fool-proof method for doing it. As one regulatory commission aptly noted, the issue "must be analyzed in the context of the individual rate proceedings and that the commission has discretion in determining, in light of all the facts and circumstances of an individual rate proceeding, the most appropriate method of coping with this problem." Re New England Telephone & Telegraph Co., 10 P.U.R. 4th 132, 142 (R.I.1975); see also, Re Orange and Rockland Utilities, Inc., 98 P.U.R. 3d 335, 348 (N.Y.1973). The Company acknowledges that attrition can be determined from historical trends and concedes that the selection of the time frame to be used in such a forecast is a matter of judgment. South Central Bell argues, however, that the Commission should not have gone back ten years in establishing an historical pattern. Its argument appears to be founded on the assumption that the growth pattern of revenues, expenses, and rate base during this period will not correspond with that to be expected in the future. The Commission, on the other hand, concluded that a briefer period would not provide a valid time frame reflecting the Company's probable future growth patterns. We cannot say that either party's opinion is unreasonable or arbitrary, and in such cases we will respect the judgment of the Commission which has *979 been constitutionally entrusted with the responsibility of making the determination.
We therefore conclude that the district court erred in rejecting the Commission's findings on attrition. The findings of the Commission should not be set aside by the courts unless they are unreasonable or arbitrary. Further, the district court exceeded its authority in accepting and relying on the company's data which was filed on remand and which had not been verified and subjected to expert critical analysis. In discussing judicial review of administrative proceedings this Court, in White v. Louisiana Public Service Commission, 259 La. 363, 250 So.2d 368 (1971), stated:
"* * * Ordinarily, review of administrative rulings does not even allow the trial court or this court to make independent findings of fact where there are findings of fact in the record, unless there is a showing that the findings of fact were arbitrary and unreasonable and made without substantial evidence. Moreover, new facts are not ordinarily received by courts for an independent determination on purely administrative adjudications. * * *" 250 So.2d at 372.
The only clear statutory provision for the taking of additional evidence by a court in a rate proceeding requires the court to submit the evidence to the Commission specifically for its consideration and for further determinations within its sound discretion. La.R.S. 45:1194.[3] Although this procedure would not have been practicable in the instant case, and the court properly remanded the complex issue of attrition to the Commission for consideration and determination upon evidence which the Commission within its sound judgment deemed appropriate, the statute does reflect a legislative intent that judicial review should not be based on evidence which has not been verified and analyzed by the Commission. Cf. Delaware Alcoholic Beverage Control Comm. v. Mitchell, 7 Storey 103, 57 Del. 103, 196 A.2d 410 (Del.1963); Alcoholic Beverage Control Board v. Eversole, 275 S.W.2d 55 (Ky.1955); Fascination, Inc. v. Hoover, 39 Cal.2d 260, 246 P.2d 656 (1952).
The Commission reserved the attrition issue for appeal and contends that no allowance whatsoever should be granted, but there is no merit to its contention. The Commission's own detailed study demonstrates that attrition probably did occur in 1976 and there is no evidence in the record which contradicts this finding in a convincing manner.
Accordingly, the allowance to offset attrition granted by the district court must be set aside, and the attrition allowance determined by the Commission should be formally adopted and implemented.

Research and Development
South Central Bell included in its test year expenses an amount paid under a license contract agreement to A. T. & T. for various services and benefits, among which was the right to share in the results of Bell System research and development. Until October 1, 1974, the amount charged South Central Bell under the contract could not exceed 1% of the subsidiary company's revenues; at that time, however, the maximum was increased to 2½% of the gross annual earnings. Other operating companies of the Bell System have similar contracts with A. T. & T.
*980 The Commission expressed reservations about the validity of any assessment in excess of 1% of gross earnings because of the unique relationship between South Central Bell and its parent and the vagueness of the utility witnesses' evidence concerning the services performed under the agreement. Instances in which other regulatory agencies have totally disallowed such increases were cited by the Commission: Re South Central Bell Telephone & Telegraph Co., 12 P.U.R. 4th 426 (Ky.1972); Re New England Telephone & Telegraph Co., 11 P.U.R. 4th 297 (Mass.1975). Rather than completely disallowing the increase, however, the Commission found that it would be appropriate to require that the amount attributable to research and development costs be capitalized and amortized over a future period of approximately twenty years.
The Commission acknowledged the accepted accounting practice of treating research and development costs as current expenses, but decided that the costs should be capitalized to conform with a more basic principle of economics and regulation, i. e., costs which benefit future ratepayers should be capitalized and expensed in the future. The Commission explained the reasons and calculations underlying its treatment as follows:
"The fact that accountants often treat research and development expenditures as a current expense is no reason for doing so for regulatory purposes. It appears that the basic reason why accountants reflect research and development as a current expense is that there is uncertainty, or at minimum, a high degree of risk associated with the prediction of the revenue accomplishments associated with research and development costs as compared to other asset expenditures. When faced with a high degree of uncertainty, the accountant invokes the convention of conservation and effects an immediate charge off of research and development costs. This conservative approach is, however, in conflict with the more basic underlying accounting concept which calls for an association of costs with the time periods benefited and/or the revenues produced by such costs. However, under regulation there is no uncertainty as to the inclusion of research and development costs in the price of a regulated public utility's service.
"In order to bring South Central Bell's net operating income into accord with sound principles of regulation and economics, we have made an adjustment to reflect the capitalization and subsequent amortization of research and development costs. We have used the ratio of research and development expense to total allocated license contract expense of 39 per cent as shown in the record for the year 1974. Thus, 39 per cent of the 1975 license contract expense was treated as research and development expense. After allowing for annual amortization at the overall depreciation rate of 5.3 per cent and a return of 13.33 per cent (the allowed before-tax rate of return on 1975) on the capitalized portion of research and development, we find that an aftertax adjustment to increase net operating income of $853,000 is required." 15 P.U.R. 4th 87, 115-16.
The district court found the Commission had no reasonable basis for departing from its past practice of treating the research costs as current expenses. Accordingly, the court disapproved this adjustment as an abuse of regulatory discretion.
In this Court South Central Bell argues that the district court's decision was justified because the adjustment by the Commission was arbitrary and unreasonable. It asserts that the Commission's change from treating research payments as current expense to requiring capitalization and future amortization is contrary to the Uniform System of Accounts prescribed by the F. C. C., to generally accepted accounting principles, and to the past practices of the Public Service Commission. The Company further contends that no regulatory commission has ever approved such an adjustment, and that some commissions have considered and rejected the capitalization treatment. See, Re Chesapeake and Potomac Telephone Co., *981 ___ P.U.R.4th ___ (Md.1977); Ohio Bell Telephone Co., 15 P.U.R.4th 344 (Ohio 1976).
South Central Bell's statement of the agency determinations in the above-cited cases is essentially correct. However, in both of these proceedings, the regulatory agency itself, after a review of all of the evidence, determined that current expense treatment was preferable to capitalization. These decisions were based simply upon what the agencies perceived to be the better accounting procedure; the agencies did not reject capitalization because they thought it would amount to arbitrary or unreasonable regulatory action. Furthermore, we are aware of no appellate court decision in which such a conclusion was reached.
In our earlier discussion of capital structure, we articulated our view that consistency of administrative treatment is desirable and that capricious alterations of regulatory practices will not be upheld. Nevertheless, the Commission is free to make modifications in its rate making procedures which are reasonably calculated to protect the interests of Louisiana ratepayers while treating the utility fairly. Otherwise, there could be no improvement in the regulatory process or variation to meet changing circumstances. In the instant case, we find that the actions of the Commission were not arbitrary or precipitous. The adjustment made by the Commission was its first change of course regarding the treatment of South Central Bell's research and development costs, and the change was apparently instituted in good faith after careful consideration.
Moreover, the Commission's determination to depart from current expense treatment appears to have an adequate rational basis. The line of demarcation between capital expenditures and revenue charges is a flexible one that is a source of disagreement between accountants in tax matters and in other areas. See, E. M. Faris, Accounting for Lawyers, pp. 85-92 (3d ed. 1975). The fact that capitalization of research costs may not accord with accounting practices prescribed by the F. C. C. does not necessarily render it unreasonable. As we have seen in the case of adjustment and treatment of other financial data for regulatory purposes, accounting rules and even legal forms sometimes must be disregarded by the rate making body in order to properly account for economic realities and to defend legitimate ratepayer interests. Accounting practices are established for the benefit of many different observers of corporate activity, and a practice may vary depending upon whether it was adopted to facilitate analysis by stockholders, creditors, management or the Internal Revenue Service. See, Faris, supra, p. 86. Although an accounting procedure formulated for a non-regulatory purpose may provide one rational basis for a regulatory determination, there is no logical reason why a rate making agency cannot base its decision upon another reasonable procedure devised solely for the purpose of considering the merits of a proposed utility rate increase.
Because the reasons advanced by the Commission for its ruling make a great deal of sense when judged on their merits, and because the departure from past regulatory practice was not unfair under the circumstances, proper judicial inquiry should have ended with the conclusion that the administrative agency's determination was not arbitrary or unreasonable.

Separations
The Louisiana Public Service Commission may regulate only intrastate utility operations. Consequently, the Company's investment and expenses devoted to interstate services should not be considered in the state agency's regulatory process. This presents a problem because the major portion of the Company's telephone property is used in common for both intrastate and interstate services. Similarly, the major portion of the expenses is incurred in the joint rendition of these services. In state rate making, this problem is resolved by subtracting from the mixed investment and the mixed expenses a percentage which has *982 been allocated to interstate service in order to assure that intrastate rates are fixed on the basis of the correct rate base and expenses. This procedure is called "separations" in the telephone industry.
The Supreme Court, in Smith v. Illinois Bell Telephone Co., 282 U.S. 133, 51 S.Ct. 65, 75 L.Ed. 255 (1930), established the principle of "actual use" or "relative use" as a proper basis for the separation of telephone property, revenues and expenses between the interstate and intrastate operations of the company involved. Generally speaking, the actual use of telephone lines for interstate calls may be determined from the Company's time records of interstate toll calls. The interstate use of plant, switching facilities and related expenses, however, cannot be determined directly from the records. Instead, this is estimated by developing a ratio or factor, called the "subscriber plant factor," which is then applied to the pertinent investment and expenses in order to allocate the appropriate portion to interstate operations. The "subscriber plant factor" is derived from a simpler ratio or fraction based on interstate toll call time records, called the "subscriber line use" ratio. The numerator of the "subscriber line use" ratio or fraction consists of the total minutes of interstate use, and the denominator consists of the total minutes of use of the lines, both intrastate and interstate. The "subscriber line use" ratio is multiplied by 3.39 to determine the "subscriber plant factor." The 3.39 is an element used to reflect the fact that "toll rate schedules inherently have a deterrent effect on the use of non-traffic sensitive plant."[4] Thus it is apparent that a substantial understatement or overstatement of the minutes of interstate use in the numerator of the "subscriber line use" ratio will significantly affect the related "subscriber plant factor" and the allocation of plant and switching facilities to interstate operations.
The separations controversy in this case involves the question of whether the minutes of interstate use in Louisiana by the Federal Telecommunications System (FTS), an extensive system of interstate private lines leased to the federal government, should be included in the numerator of the "subscriber line use" ratio. It is undisputed that all of the revenues received by the Company from FTS are interstate revenues. The FTS calls, which are mostly interstate, flow through lines and plant used jointly by local, intrastate calls. However, the total interstate minutes of use by FTS are not recorded because FTS is billed on a flat charge, rather than being billed on the regular customer basis of minutes per call. It is primarily for this reason that the Company takes the position that the FTS use of facilities in Louisiana should not be included in the numerator of the "subscriber line use" ratio.
The Commission did not approve the utility's proposed treatment in the rate proceeding. Instead, the agency approximated[5] the amount of line use by FTS and used all of it in determining the "subscriber line use" ratio, which it in turn used to derive the "subscriber plant factor." On the basis of these formulae, the Commission adjusted the Company's data and calculations to require additional separations in the amounts of $10,192,000 from intrastate rate base and $3,562,000 from intrastate expenses. The district court affirmed finding that the Commission's estimate and adjustments were reasonable in the absence of accurate evidence directly showing the actual amount of time the lines were used by FTS in interstate communications. On appeal South Central Bell attacks on several grounds the Commission's method of estimating the FTS minutes of use of Company lines as well as its decision to include them in the numerator of the "subscriber line use" ratio.
*983 South Central Bell places great reliance on its interpretation of the Separations Manual developed by the National Association of Regulatory Utility Commissioners. According to the manual's foreword it represents the product of the joint efforts made over a period of many years by the technical experts of the regulatory agencies and telephone industry to design fair and equitable separations methods. The manual recognizes the "actual use" principle established by Smith v. Illinois Bell Telephone Co., supra, as the "fundamental basis on which separations are made." NARUCFCC Cooperative Committee on Communications, Separations Manual, ¶ 11.13 (1971). Nevertheless, the Company contends, as we understand its argument, that one of the manual's provisions implies that the actual use by FTS of plant and lines in interstate calls should not be estimated by use of the "subscriber plant factor" and must be ignored in the absence of systematic time use measurement records. That provision, ¶ 11.22(3)(d), states:
"Underlying the procedures included in this manual for the separation of plant costs is an over-all concept which may be described as follows:
"* * *
"3. In general, the bases for apportioning telephone plant used jointly for state and interstate operations are:
"* * *
"d. A subscriber plant factor is the basis for apportioning the cost of message telephone subscriber plant and the non-traffic sensitive portion of local dial switching plant between state and interstate operations. The subscriber plant factor is developed by the use of a two part formula (See Par. 23.444), the first part of which is designed to develop a basic cost per holding time minute of use for application alike to each exchange and toll holding time minute of use and the second part of which is designed to add to the basis cost thus assigned to each toll holding time minute an additive cost reflective of the fact that toll rate schedules inherently have a deterrent effect on the use of non-traffic sensitive plant and that this deterrent effect increases as the distance of the related toll call increases." (Emphasis supplied).
According to the Company, the reference to the deterrent effect of toll rate schedules implies that the "subscriber plant factor" is to be used exclusively for apportioning costs incurred in serving subscribers who pay long distance tolls and not the FTS which pays a flat charge. Furthermore, the utility argues, it is unfair to apply to FTS use the additive cost built in to the "subscriber plant factor" to reflect that long distance callers tend to curtail conversations due to the graduated costs of toll fares; a caller on FTS, which pays a flat rate, is not subject to any such deterrent effect, according to the Company.
The Commission effectively counters these arguments, first, by pointing out that they are contrary to the basic principle that separations should be made on the basis of actual use. To disregard the actuality that FTS interstate calls flow through lines and equipment supported by Louisiana ratepayers simply because the Company has not kept records of the calls would be to exalt form over substance and to require the Company's intrastate subscribers to bear the cost of investment and expenses devoted to interstate operations. Moreover, as the Commission correctly indicates, in addition to the paragraph stating that actual use is the fundamental basis for separations, there are several other provisions of the Separations Manual which demand that all minutes of use be considered for cost allocation purposes. See, 15 P.U.R.4th at 103. The Commission further contends that usage of the FTS is subject to a deterrent effect similar to long distance toll use because the government monitors and limits the duration of calls on its lines to avoid inefficiency and the expense of additional lines. Although the agency does not cite any evidence in the record supporting this conclusion, the Company does not contest it, and we note that another commission has made a similar determination. Re Chesapeake & Potomac Telephone Co., 4 P.U. R.4th 1, 12 (1974). For these reasons we *984 agree with the district court that the Commission interpretation of the Separations Manual is reasonable and should be affirmed. A strong argument could also be made for the proposition that the Commission is not necessarily bound by the Separations Manual but is free to apply any reasonable method of separation which is not arbitrary, capricious or unfair. We pretermit a consideration of this issue, however, as being unnecessary to our decision in this case.
The Company claims that its treatment of the FTS minutes of use is the same as that employed by all other jurisdictions, except for the District of Columbia Commission. We have examined the single case cited by South Central Bell in support of its separations procedure, Re Ohio Bell Telephone Co., 15 P.U.R.4th 344 (Ohio 1976), and have compared it with the decision of the District of Columbia Commission advancing the opposite viewpoint. See, Chesapeake & Potomac Telephone Co., 4 P.U. R.4th 1 (1974). We frankly find the reasons given in the Chesapeake & Potomac opinion to be more persuasive and more consistent with the notion of separating revenue, property and expenses between intrastate and interstate operations on the basis of the actual use to which the utility's property is put. As a matter of fact, the Commission in the Ohio Bell proceedings advanced no reasons except its conclusion that the weight of the evidence indicated the company's methodology was proper and reasonable. On judicial review the fact that our commission has aligned itself with a minority view should not be allowed to obscure the logic and reasonableness of its position. Although impressive numbers of authorities may be arrayed on the other side of the issue, once we determine, as we do here, that the Commission has not been unreasonable or arbitrary in its procedures our judicial inquiry is at an end.
South Central Bell also advances an argument based on equitable considerations. It urges that the Commission's separations procedure will create a hiatus in that the investment and expenses in question will not be included in either a state or an interstate regulatory jurisdiction; consequently, there will be no compensation for a substantial amount of the Company's property. The Commission takes issue with this prediction, stating that even if the property and expenses are excluded altogether from consideration in the fixing of intrastate rates the Chesapeake & Potomac case demonstrates the likelihood they will be accepted by the F.C.C. in fixing rates. Although the case does seem to support the Commission's assertion, we are not prepared to evaluate its prediction on the basis of this decision alone. Weighing the equities independently of this argument by the Commission, however, we find that the principles articulated in Smith v. Illinois Bell Telephone Co., supra, indicate that the Commission's approach to separations was equitable from the standpoint of apportionment of costs on the basis of actual use. In holding that an allocation of cost of exchange property between intrastate and interstate message services was required, the court stated:
"While the difficulty in making an exact apportionment of the property is apparent, and extreme nicety is not required, only reasonable measures being essential [citations omitted] it is quite another matter to ignore altogether the actual uses to which the property is put. It is obvious that, unless an apportionment is made, the intrastate service to which the exchange property is allocated will bear an undue burdento what extent is a matter of controversy. We think that this subject requires further consideration, to the end that by some practical method the different uses of the property may be recognized and the return properly attributable to the intrastate service may be ascertained accordingly." 282 U.S. at 150, 51 S.Ct. at 69, 75 L.Ed. at 264.
The principles announced in the Smith case fully support the action of the Commission. It is clear that South Central Bell's property is being employed in providing service to both the interstate FTS and the local, intrastate ratepayers. The Commission reasonably determined that to make a proper apportionment *985 would not require an extreme nicety, and failure to act would require that it ignore altogether the actual uses to which the property was being put. It is obvious that unless the Commission had required an adjustment in the apportionment the intrastate service would have borne an undue burden. In our opinion the action taken by the Commission in assigning to the interstate operations a fair share based on actual use was more equitable and more in keeping with the principles of sound rate making than giving preferred treatment to the interstate operations by ignoring the FTS use.
In its final argument the Company assails the method by which the Commission estimated the FTS minutes of use as having been based upon a premise that is contrary to the evidence. The Commission found that one of South Central Bell's 176 exchanges within the state of Louisiana was dedicated exclusively to serving the FTS network. Assuming that each exchange produced the same amount of minutes of use and that all of the FTS minutes of use were involved with interstate communications, the Commission recomputed the "subscriber line use" ratio and the "subscriber plant factor." These recomputations led to the Commission's adjustments decreasing the intrastate rate base and the intrastate expenses mentioned earlier.
South Central Bell now contends that the ratio of 1/176, which is the mathematical base from which the Commission's entire recomputation flows, was founded upon a faulty assumption. According to the Company's brief, South Central Bell has not dedicated one whole "exchange" to handling the FTS traffic as the Commission assumed, but only one of the many "switching facilities" in the "exchange" in question. If this is correct, the key to the Commission's separations adjustment is contrary to fact.
The evidence underlying this purely factual determination is sketchy and ambiguous. One of the Company's witnesses testified as follows:
"Q. You mentioned that you have a dedicated switching facility providing this Switched Private Line Service [for the FTS], is that correct?
"A. That is correct."
Another utility witness' prepared statement, in generally describing the facilities of the Company, alluded to the fact that in Louisiana the Company serves its customers "through 176 exchanges, many of which contain numerous switching centers." We have not been directed to any other evidence shedding light on this issue. Nor have we discovered any means, using the present record, by which we could discover with reasonable certainty the meaning in context of the three terms in question, viz., "exchange," "dedicated switching facility," and "switching center." Under these circumstances, although we are prepared to accord the proper respect to the facts as found by the Commission, we conclude there is not sufficient evidence in the record to support a factual determination crucial to its estimation.
Accordingly, we approve the Commission's decision to include the FTS minutes of interstate use in the numerator of the "subscriber line use" ratio; we agree with the district court that the Commission's method of estimating such use was reasonable in the absence of accurate evidence showing the precise measurement of minutes employed in intrastate versus interstate use during the 1975 test year; but because of the lack of supporting evidence we will remand the case to the Commission for reconsideration and clarification of its factual determination that one of the Company's 176 exchanges is dedicated entirely to FTS traffic.

Conclusion
Except for any revision which may be required by the reconsideration of the factual issue involved in the separations adjustments, we conclude that the total effect of the Commission's rate order, when combined with its attrition allowance, cannot be said to be unjust or unreasonable. Specifically, we find that the Commission fairly and reasonably determined for regulatory purposes the Company's capital structure, *986 cost of debt, cost of equity and fair rate of return. The Commission's attrition allowance and research and development adjustment were not arbitrary or unreasonable. We approve of the Commission's approach and calculations in making its separations adjustments, but we find that there is not sufficient evidence to support one factual finding crucial to its determination.
For the foregoing reasons the judgment of the district court is vacated and the case is remanded to the Commission with the following instructions. The Commission is directed to reinstate its original research and development adjustment, adopt the attrition allowance calculated by it on remand from the district court, and reconsider and redetermine its factual finding that the Company dedicated one of its 176 exchanges entirely to FTS traffic during the test year. In reconsidering this factual issue the Commission may, within its discretion, take any additional evidence which it deems necessary. After complying with the above instructions and making any modifications of its separations adjustments necessitated by a redetermination of the factual question, the Commission shall proceed without taking further evidence to decide whether the Company is entitled to a rate increase, and to enter such order as justice may require.
Because of the extensive delays in this case, which have been contributed to by the reorganization of the public service commission required by the Louisiana Constitution of 1974, we will retain jurisdiction of this matter under our general supervisory jurisdiction for expeditious review. If the Company is dissatisfied with the Commission's decision, it may by motion filed in this Court within fifteen days following the Commission's action, bring the matter before us for further consideration.
The district court judgment is vacated and the case is remanded to the public service commission with instructions.
SANDERS, C. J., concurs in part and dissents in part with written reasons.
MARCUS, J., dissents and assigns reasons.
SUMMERS, J., dissents for the reasons assigned by MARCUS, J.
SANDERS, Chief Justice (concurring in part and dissenting in part).
I concur with the majority in the resolution of all major issues save two: the attrition allowance and research and development costs. As to these, in my opinion, the determinations of the district court are correct and fall within the proper scope of judicial review. I would affirm the judgment of the district court.
For the reasons assigned, I concur in part and dissent in part.
MARCUS, Justice (dissenting).
I dissent from the majority opinion. I do not consider that the majority in affirming the Commission allows South Central Bell a fair rate of return. First, I believe that the decision to utilize the capital structure of the Bell System, rather than that of South Central Bell, is incorrect. I feel that South Central Bell's capital structure of 45% debt and 55% equity is the appropriate ratio to use in determining the company's overall rate of return. Secondly, I consider the majority erred in affirming the Commission in fixing the cost of debt at that of the Bell System. On the contrary, I believe that South Central Bell's actual cost of debt of 7.61% is the proper cost to be used in computing its rate of return. Thirdly, I agree with the majority and the Commission in fixing South Central Bell's cost of equity at 10.5-11.5%. Predicated on these findings and applying the formula accepted by the Commission, I find that South Central Bell is entitled to earn 9.20-9.75% as a fair rate of return. Accordingly, I would recommend that the case be remanded to the Commission to increase rates to produce additional revenues so that South Central Bell would be able to realize an overall rate of return of 9.20%.
I also disagree with the majority in affirming the attritional allowance of $6,714,000 found by the Commission. I find this *987 amount insufficient. Although I approve the method used by the district judge in determining the attritional allowance, I do not believe he accorded sufficient weight to certain factors which tend to offset the effects of attrition. Therefore, I consider the $26,320,000 allowed by the district court too high. However, in view of my conclusion that South Central Bell is entitled to an overall rate of return of 9.20% and taking into consideration the factors which tend to offset attrition, I conclude that the attritional allowance of $26,320,000 is appropriate under the circumstances to assure that the company will realize this increased rate of return during the present inflationary period. Accordingly, I would affirm the district court's allowance of $26,320,000 for attrition.
Furthermore, I disagree with the majority's affirmance of the Commission's treatment of research and development costs. I do not feel that these costs should be capitalized; rather, I agree with the district court that the cost attributable to research and development should be treated as an operating expense.
Finally, I agree with the Commission's allocation or "separation" of investment and expenses of the FTS between interstate and intrastate jurisdictions. I believe that the Commission's decision was proper and appropriate under the circumstances. I do not find that a remand is necessary on this point.
I shall now proceed to set forth my reasons for arriving at the foregoing conclusions. I consider it necessary and appropriate to review in detail the history of the proceedings, the contentions of the parties, the applicable law, and the individual issues involved.

HISTORY OF PROCEEDINGS
On April 18, 1975, South Central Bell, a wholly-owned subsidiary of American Telephone and Telegraph Company (hereinafter referred to as AT&T), filed an application before the Commission seeking an increase in intrastate tariffs sufficient to provide an additional $73,000,000 in gross revenues per annum on a Louisiana intrastate basis. The application was based on data and computations concerning a forecasted test year ending June 30, 1976. In November, 1975, South Central Bell submitted new evidence to the Commission relying on a forecasted test year ending December 31, 1976, and amended its application by requesting additional tariffs of $16,000,000, thereby seeking a total increase in tariffs of $89,000,000. While the proposed rate increase was under consideration by the Commission, South Central Bell filed a petition for injunction and mandamus in the district court to require a decision by the Commission on the company's application for a rate increase by April 18, 1976, and the establishment of interim rates under bond in absence of a decision by the Commission. The district court issued a writ of mandamus ordering the Commission to render its decision no later than April 18, 1976, and, in default thereof, to implement the proposed rate increase, subject to a bond to assure refunds.[1] Pursuant to an application filed by the Commission, this court issued an order to stay the execution of the judgment of the district court and also issued a writ of certiorari to review the correctness of the lower court's ruling.[2] After review, this court reversed the judgment of the district court and ordered that a writ of mandamus issue to the Commission directing it to render a decision on South Central Bell's application for a rate increase no later than thirty days from the finality of the judgment. However, this court concluded that the trial judge was without authority to order the interim rate increase.[3]
On June 15, 1976, the Commission issued an order in which it denied in full South Central Bell's application for a rate increase.[4] *988 In its written opinion, the Commission, inter alia, found that 1975 was the appropriate test year, using the average rate base for that year, thereby rejecting the use of forecasted test years for the purpose of establishing rates as requested by South Central Bell. After finding that the capital structure of the Bell System was the appropriate one to use in the determination of the rate of return of South Central Bell, the Commission then fixed the cost of debt for South Central Bell at 6.8% and the cost of preferred stock at 7.8%. These figures were based on the actual cost rates of debt and preferred stock of the Bell System rather than South Central Bell's cost of debt of 7.61%. The Commission fixed the cost of equity at 10.5-11.5% and computed the overall rate of return at 8.55-9.01%. The Commission's order became effective on June 28, 1976.
On July 23, 1976, pursuant to La.Const. art. 4, § 21(E) (1974),[5] South Central Bell filed a petition in the district court seeking judicial review of the Commission's order dated June 15, 1976. It further sought an injunction to permit the imposition of an interim rate increase pending the outcome of its appeal.[6] The application for an injunctive relief was denied by the district court which ruling was affirmed by this court on appeal.[7]
On January 4, 1977, the district court, in written reasons for judgment on South Central Bell's application for judicial review of the Commission's order dated June 15, 1976, upheld the Commission's order on all but one of the regulatory issues presented for its review. Specifically, the district court disagreed with the Commission's determination that research and development costs paid by South Central Bell to AT&T under the License Contract Agreement should be capitalized and recouped in the future through amortization but rather concluded that these costs should be treated as a current expense item. The district court further found that the Commission committed error by not making an allowance in fixing rates for the effects of attrition and inflation to offset their impact on the rate of return and remanded the case to the Commission to make whatever adjustments in the rates as were necessary to permit South Central Bell to realize the rate of return found by the Commission and approved by the court as fair. The court stated that such action was to be completed by the Commission within forty-five days from the date of the judgment. On January 6, 1977, a judgment, drafted and presented to the district court by South Central Bell, was adopted by the court in which it was ordered that the case be remanded to the Commission for further proceedings and "specifically for the purpose of receiving evidence" and making any findings necessary to comply with the judgment of the district court. Pursuant to this judgment, South Central Bell submitted to the district court and to the Commission new evidence in the form of affidavits and filed testimony of three expert witnesses which related the effects of attrition on the overall rate of return of the company. Subsequently, the Commission filed in the district court a motion to amend the judgment by altering its phraseology so as "to eliminate any uncertainty that the receipt and consideration by the Commission of new evidence not contained in the record on the remand of this case is discretionary." Opposition to this motion was asserted by South Central Bell which argued that any alteration in the phraseology of the judgment would involve a substantive matter which could only be modified by a motion for a new trial, the delay for which had already run. The district court denied any formal amendment of the judgment but explained that consideration of the evidence filed by South Central Bell on the remand was discretionary with the Commission.
*989 On February 16, 1977, following a review of the case on remand from the district court, the Commission reported its findings to the district court as to the adjustments necessitated by the expensing of research and development costs and by allowance for attrition. Specifically, after making adjustments to comply with the district court's decision to expense research and development costs, the Commission concluded that an increase in rates of $1,728,000 was necessary to preserve the 8.7% rate of return. The Commission also found that an additional increase in rates of $6,714,000 was necessary to offset the impact of attrition on the overall rate of return. Hence, a total rate increase of $8,447,000 was required to implement the findings of the district court.[8] After return of the record to the district court, South Central Bell filed a petition for review of the Commission's findings in which the company argued that the attrition allowance specified by the Commission was inadequate in that a revenue increase of about $53,000,000 was needed to offset the impact of attrition and inflation. On March 11, 1977, the district court amended the order of the Commission and ordered intrastate rates increased to produce an additional $26,320,000 in revenues to offset the effects of attrition and inflation as of January 1, 1976 so that an overall rate of return of 8.7% which was realized by South Central Bell in the historical test year of 1975 might be preserved. Both South Central Bell and the Commission have appealed from this decision.[9]

CONTENTIONS
On appeal, South Central bell assigns as error:
(1) the Commission's decision to utilize the capital structure of the Bell System, rather than that of South Central Bell, in computing the overall rate of return of the company;
(2) the Commission's decision to assess the cost of debt at the Bell System's cost of 6.8%, as opposed to the company's cost of debt of 7.61%;
(3) the Commission's decision to fix the cost of equity at 10.5-11.5% in that such return is far below that required by South Central Bell to attract new capital and to pay investors a fair return and is discriminatory when compared with the earnings of other utilities having corresponding risks;
(4) the district court's denial of South Central Bell's request for an additional allowance of $21,000,000 to $26,000,000 to offset the effects of attrition and inflation experienced by the company since the 1975 historical test year; and
(5) the Commission's finding that an allocation of investment and expenses of the Federal Telecommunications System between intrastate and interstate jurisdictions was required.
The Louisiana Public Service Commission has answered this appeal and in turn assigns as error:
(1) the district court's ruling which ordered an increase in intrastate rates to provide for an allowance for attritional effects and which fixed the allowance at $26,320,000 based upon evidence filed by South Central Bell with the district court and the Commission on remand; and
(2) the district court's determination to require the expensing of research and fundamental development costs paid by South Central Bell to AT&T pursuant to the License Contract Agreement, as opposed to the capitalization and recoupment of these costs in the future as proposed by the Commission.

LAW
La.Const. art. 4, § 21(B) (1974) provides that the Louisiana Public Service Commission *990 "shall regulate all common carriers and public utilities and have such other regulatory authority as provided by law. It shall adopt and enforce reasonable rules, regulations, and procedures necessary for the discharge of its duties, and shall have other powers and perform other duties as provided by law." Under La.Const. art. 4, § 21(E) (1974), an appeal may be taken in the manner provided by law by any aggrieved party to the district court. All such cases shall be tried in the same manner as civil cases. The court may affirm the order of the Commission complained of, or it may change, modify, alter, or set it aside, as justice may require. La.R.S. 45:1192. A right of direct appeal from any judgment of the district court shall be allowed to the supreme court. These rights of appeal shall extend to any action of the Commission. La.Const. art. 4, § 21(E) (1974). According to the settled jurisprudence of this court, the orders of the Louisiana Public Service Commission must be accorded great weight and will not be disturbed in the absence of a clear showing of abuse of power. Greater Livingston Water Company v. Louisiana Public Service Commission, 294 So.2d 501 (La.1974); Monochem, Inc. v. Louisiana Public Service Commission, 253 La. 1047, 221 So.2d 504 (1969); United Gas Pipe Line Co. v. Louisiana Public Service Commission, 241 La. 687, 130 So.3d 652 (1961); Southern Bell Telephone & Telegraph Co. v. Louisiana Public Service Commission, 239 La. 175, 118 So.2d 372 (1960); Gulf States Utilities Co. v. Louisiana Public Service Commission, 222 La. 132, 62 So.2d 250 (1952). Courts should act slowly in substituting their own views for those of the expert body charged with the legislative function of rate making, a technical field which embraces farreaching economic policies.
The obligation of the Louisiana Public Service Commission in rate cases is to fix "just and reasonable rates" to be charged by public utilities. La.R.S. 45:1176. The fixing of rates involves a delicate balancing of consumer and investor interests. Rulings of the Louisiana Public Service Commission in which intrastate rates for public utilities are fixed will be upheld when the rates so fixed are "just and reasonable." Only where the action of the Commission is found to be arbitrary or capricious in that it is either plainly contrary to the facts or unsupported by evidence will the rates be declared to be unjust and unreasonable. Gulf States Utilities Co. v. Louisiana Public Service Commission, supra. The guiding principles have been laid down in the case of Federal Power Commission v. Hope Natural Gas Company, 320 U.S. 591, 64 S.Ct. 281, 88 L.Ed. 333 (1944) where the Court said:
Under the statutory standard of `just and reasonable' it is the result reached not the method employed which is controlling. Cf. Los Angeles Gas & E. Corp. v. Railroad Commission, 289 U.S. 287, 304, 305, 314, 53 S.Ct. 637, 77 L.Ed. 1180, 1191, 1192, 1197; West Ohio Gas Co. v. Public Utilities Commission, 294 U.S. 63, 70, 55 S.Ct. 316, 79 L.Ed. 761, 768; West v. Chesapeake & P. Teleph. Co., 295 U.S. 662, 692, 693, 55 S.Ct. 894, 79 L.Ed. 1640, 1657, 1658 (dissenting opinion). It is not theory but the impact of the rate order which counts. If the total effect of the rate order cannot be said to be unjust and unreasonable, judicial inquiry under the Act is at an end. . . .
The rate-making process under the Act, i. e., the fixing of `just and reasonable' rates, involves a balancing of the investor and the consumer interests. . . . [T]he investor interest has a legitimate concern with the financial integrity of the company whose rates are being regulated. From the investor or company point of view it is important that there be enough revenue not only for operating expenses but also for the capital costs of the business. These include service on the debt and dividends on the stock. . . By that standard the return to the equity owner should be commensurate with returns on investments in other enterprises having corresponding risks. That return, moreover, should be sufficient to assure confidence in the financial integrity of the enterprise, so as to maintain its credit and to attract capital. . . .

*991 . . . Rates which enable the company to operate successfully, to maintain its financial integrity, to attract capital, and to compensate its investors for the risks assumed certainly cannot be condemned as invalid, even though they might produce only a meager return on the so-called `fair value' rate base.
A fair rate of return in a given case is a judgment percentage of the rate base which the utility is entitled to earn for interest, dividend payments and related requirements. The return should be reasonably sufficient to assure confidence in the financial soundness of the utility, and should be adequate, under efficient and economical management, to maintain and support its credit and enable it to raise the money necessary for the proper discharge of its public duties. Bluefield Water Works & Improvement Company v. Public Service Commission of State of West Virginia, 262 U.S. 679, 43 S.Ct. 675, 67 L.Ed. 1176 (1923). The question of the reasonableness of a return is one of fact rather than of law requiring the application of enlightened judgment to the multiplicity of variables disclosed by the evidence. United Gas Pipe Line Co. v. Louisiana Public Service Commission, supra.

CAPITAL STRUCTURE
South Central Bell contends that the Commission was arbitrary in utilizing the capital structure of the Bell System in computing its overall rate of return rather than its actual capital structure. In defense of its decision, the Commission argues that, since South Central Bell is a wholly-owned subsidiary of AT&T, it is appropriate to use the capital structure of the Bell System in determining the rate of return of South Central Bell.
The evidence presented to the Commission revealed that during the test year of 1975 South Central Bell's capital structure was approximately 45% debt and 55% equity before stock issues and short-term repayments. On the other hand, the capital structure of the Bell System during this period was approximately 49.5% debt, 4.4% preferred stock and 46.1% common equity. Several expert witnesses testified that the announced objective capital structure of AT&T was a debt ratio of 45%, similar to that of South Central Bell. Moreover, an opinion was expressed that in the absence of this publicly-announced objective and of steps taken by AT&T to achieve this reduced percentage of debt capital, it was doubtful that the bonds of the Bell System companies would maintain their AAA rating. Expert testimony further revealed that a decrease in the debt ratio of the Bell System to 45% was desirable in that it would result in a reduction of the cost of debt and equity capital and would increase access to the capital markets. Based on these facts, expert witnesses advocated the use of a capital structure of 45% debt and 55% equity in computing South Central Bell's overall rate of return.
Nevertheless, the Commission rejected the use of South Central Bell's actual capital structure of 45% debt and 55% equity and instead adopted the capital structure of the Bell System. It did not consider the debt ratio of the Bell System excessive nor the capital structure unreasonable. Accordingly, the Commission used the capital structure of the Bell System consisting of 49.5% debt, 4.4% preferred stock and 46.1% common equity in computing the overall rate of return of South Central Bell.
In determining the appropriate capital structure to be used in the computation of the rate of return, I consider it inappropriate to make rates for the regulated utility using the capital structure of the parent company when the actual capital structure for the company is available and more desirable. Moreover, methods of raising capital should be left to the discretion of management unless there is a substantial showing that ratepayers are being prejudiced materially by the managerial options in the area of capital financing. Mountain States Telephone & Telegraph Co. v. Colorado Public Utilities Commission, 182 Colo. 269, 513 P.2d 721 (1973); Re The Mountain States Telephone & Telegraph Co., 8 PUR 4th 514 (Colo.Pub.Util.Comm.1974).
*992 After review of the record, I am convinced that the Commission's decision to utilize the capital structure of the Bell System rather than that of South Central Bell was arbitrary and capricious. Although South Central Bell is a wholly-owned subsidiary of AT&T, it has a corporate existence separate and apart from that of its parent corporation. It is South Central Bell that is being regulated by the Commission, not either AT&T or the Bell System. Moreover, no showing was made that the capital structure of South Central Bell was either unreasonable or at variance with the usual and accepted practice or that it imposed an unfair burden on the consumer. On the contrary, South Central Bell's capital structure of 45% debt and 55% equity was considered by the expert witnesses to be financially sound and the appropriate one on which to compute the overall rate of return. The capital structure was also approved by this court as appropriate on two previous occasions. Southern Bell Telephone & Telegraph Co. v. Louisiana Public Service Commission, 239 La. 175, 118 So.2d 372 (1960); Southern Bell Telephone & Telegraph Co. v. Louisiana Public Service Commission, 232 La. 446, 94 So.2d 431 (1957). Furthermore, a capital structure of 45% debt and 55% equity was the announced objective capitalization ratio of AT&T as financial overseer of the Bell System. The arbitrary and capricious nature of the Commission's decision to use the Bell System's actual capital structure consisting of debt, preferred stock and common equity is particularly evident in view of the fact that South Central Bell has no preferred stock.
For the above reasons, I feel that the Commission's decision to utilize the capital structure of the Bell System, rather than that of South Central Bell, in computing South Central Bell's overall rate of return was unsupported by the evidence and therefore was arbitrary and capricious. As such, it constituted a clear abuse of power. I believe that South Central Bell's capital structure of 45% debt and 55% equity was the appropriate ratio on which to determine the company's overall rate of return.

COST OF DEBT
South Central Bell contends that the Commission erred in computing its rate of return upon the Bell System's cost of debt of 6.8% rather than South Central Bell's actual cost of debt of 7.61%. The Commission reasoned that once having determined that the Bell System's capital structure was appropriate to use in computing South Central Bell's rate of return, it followed that the Bell System's cost of debt should also be used.
There is no dispute as to South Central Bell's cost of debt which consists of embedded and current costs of debt capital. Giving consideration to these existing contractual interest costs as well as the estimated costs of anticipated bond offerings and short-term borrowings, the evidence was uncontradicted that South Central Bell's cost of debt would range from 7.61 to 7.71%. Accordingly, the experts concluded that the cost of debt used in computing South Central Bell's rate of return should be based on these figures.
South Central Bell's debt securities are rated AAA by both Standard & Poor's and Moody's (major bond rating agencies). This rating assures the widest possible access to the money market at the lowest possible interest rate. Expert testimony indicated that in order for South Central Bell's bonds to maintain their AAA rating, the company's earnings should exceed its interest charges by about three times. If this level of interest coverage is not sustained, the bonds would be downgraded thereby adversely affecting the company's ability to obtain needed funds and increasing their cost. Moreover, downgrading of the bonds would reduce by millions of dollars the market values of outstanding bonds held by investors. Therefore, an adequate level of interest coverage was advocated as a means of maintaining the AAA rating of South Central Bell's bonds.
Additionally, since South Central Bell is contractually obligated to pay interest charges based on the actual rates set in its debt securities, the effect of fixing cost of *993 debt at a figure lower than its actual cost of debt would be that the overall rate of return fixed by the Commission as applied to the rate base would not produce sufficient revenues to enable the company to meet its actual cost of debt without reducing its return on equity capital below that determined by the Commission as fair. Moreover, it might have the further effect of reducing the level of interest coverage to the extent of affecting the AAA rating of South Central Bell's bonds.
Accordingly, I consider that the Commission erred in fixing the cost of debt at that of the Bell System. Rather, I believe that South Central Bell's actual cost of debt of 7.61% is the proper cost to be used in computing its rate of return.[10] This finding is consistent with my previous determination that the overall rate of return should be calculated on the basis of South Central Bell's capital structure rather than that of the Bell System.

COST OF EQUITY
South Central Bell assigns as error the Commission's decision to fix the cost of equity at 10.5-11.5% in computing its overall rate of return. The company contends that the rate of return used by the Commission is far below that required to attract new capital and to pay investors a fair return and is discriminatory when compared with the earnings of other utilities having corresponding risks.
The experts who testified on behalf of South Central Bell as to the cost of equity were Mr. J. D. Matheson, vice president of South Central Bell in the Revenue Requirements Department; Mr. Robert R. Nathan, a consulting economist; Mr. Robert E. LaBlanc, a general partner and manager of Salomon Brothers, an investment banking firm; and Mr. Charles W. McCoy, president and chairman of the board of Louisiana National Bank in Baton Rouge. These experts concluded that the Commission should fix South Central Bell's cost of equity at 13-15% in computing its overall rate of return. The testimony was generally to the effect that in order to induce the commitment of new capital, a return on equity of three to five percentage points above the return available on South Central Bell's bonds would be required. Therefore, since the company's current bonds were yielding 8-10%, a return on book equity of 13-15% would be necessary to attract new stock investors. Moreover, to insure the sale of new equity at net proceeds per share at least equal to book value, the market value of its stock should be maintained at about 20% above book value. It was argued that this would be accomplished where the return on book equity was in the 13-15% range. Additionally, a comparable earnings approach was advanced to support the recommended rate of return; rates of earnings of other companies were cited for the purpose of comparison.
After reviewing the testimony and documentary evidence presented at the hearings, the Commission decided to fix South Central Bell's cost of equity for the 1975 test year at 10.5-11.5%. In support of its decision, the Commission emphasized that AT&T, the parent corporation of the Bell System, had not historically required a return on equity in excess of 10.5% in order to attract equity investment and in fact in 1975 had earned only 9.8% on its book equity. In the Commission's opinion, fixing South Central Bell's cost of equity at 10.5-11.5% would provide a safe margin as well as a rate which would have allowed the company to sell its stock above book value if its stock were traded on the open market rather than owned entirely by AT&T. The Commission was further impressed by the fact that the high rates of return recommended by the expert witnesses were attributable in large measure to the unusual impact of the recession experienced in *994 recent years. The Commission also rejected the comparable earnings approach in that no similarity of investment risk or reasonableness of earnings was established between the allegedly comparable companies and South Central Bell. Ex Parte South Central Bell Telephone Co., 87 PUR 3d 498 (La.Pub.Serv.Comm.1971).
In the final analysis, South Central Bell is entitled to earn a return on its equity capital equal to that being made on investments in other enterprises with corresponding risks and uncertainties. As the parent corporation of the Bell System, AT&T is such an enterprise and the Commission correctly used its cost of equity as the appropriate standard of comparison in fixing the cost of equity of South Central Bell. The Commission's decision to fix the cost of equity at 10.5-11.5% was based on a careful evaluation of the return on equity requirement of AT&T, which historically had not exceeded 10.5%, and an adjustment of that requirement which would have permitted the stock of South Central Bell to sell above book value if traded on the open market. Accordingly, I do not find that the Commission erred in fixing South Central Bell's cost of equity at 10.5-11.5% in computing its overall rate of return.

COMPUTATION OF THE OVERALL RATE OF RETURN
Predicated on my findings that South Central Bell's capital structure of 45% debt and 55% equity is the appropriate basis on which to compute its overall rate of return, that the cost of debt is 7.61% and that the cost of equity is 10.5-11.5%, the overall rate of return may now be determined by applying the formula accepted by the Commission and all of the expert witnesses:

Proportion of Debt × Cost of Debt
 45% × 7.61% = 3.42%
Proportion of
 Equity × Cost of Equity
 55% × 10.5-11.5% = 5.78-6.33%
 __________
Overall Rate
 of Return = 9.20-9.75%

Therefore, the overall rate of return which South Central Bell is entitled to earn is 9.20-9.75%. I consider this a fair rate of return.

ATTRITIONAL ALLOWANCE
Both South Central Bell and the Commission have appealed the district court's judgment ordering an increase in intrastate rates to produce an additional $26,320,000 in revenues to offset the effects of attrition and inflation experienced by South Central Bell since the 1975 historical test year. The Commission contends that the district court erred in granting any attritional allowance and alternatively that if the court determines an attritional allowance should be granted, the district court erred in fixing the allowance at $26,320,000, based on evidence filed by South Central Bell with the Commission on remand, rather than at $6,714,000 which was determined by the Commission to be a sufficient allowance. On the other hand, South Central Bell asserts that the court erred in granting an attritional allowance of only $26,320,000 rather than the allowance of approximately $53,000,000 requested by the company.
After remand by the district court to the Commission to make whatever adjustments necessary to offset the effects of attrition and inflation on South Central Bell's overall rate of return since the 1975 test year, South Central Bell filed with the district court and the Commission additional evidence on the impact of attrition and inflation experienced by the company in 1976 and anticipated in 1977. This evidence included the company's actual investment, revenues and expenses based on the average year 1976, year-end 1976 and forecasted data for the average year 1977. Although briefly reviewed by the Commission, this evidence was not relied on by it in determining the attritional allowance. The Commission specifically rejected the use of the year-end rate base and an adjustment to the rate of return as methods of computing the allowance but instead adopted a detailed study approach in which the relationship between revenues, expenses and plant investment (rate base) were examined during the past ten years as a means of ascertaining an appropriate allowance for attrition to offset its effect on the company's *995 future realized rate of return. On the basis of this analysis, the Commission projected an annual rate of attrition of .4% which, when applied to the 1975 average rate base adopted by the Commission and after adjustment for taxes, translated into a needed increase in revenues of $6,714,000.
After reviewing the Commission's decision, the district court rejected the attritional allowance as fixed by the Commission concluding that the Commission's action was arbitrary and unreasonable in that it would not produce revenues necessary to insure the healthy operation of the utility. Rather, the court adopted the findings of Mr. D. M. Ballard, assistant chief accountant for South Central Bell, relative to his determination of additional revenues needed to offset attrition and inflation since the 1975 test year, which findings had been filed with the Commission on remand. The additional revenues were computed by multiplying the company's average rate base for 1976 by the 8.7% rate of return authorized by the Commission to derive the 1976 required net operating income. From this figure, the company's achieved net operating income for 1976 was deducted. This produced an income deficiency after taxes. After an adjustment for taxes, the company's revenue deficiency attributable to attrition and inflation was revealed as $26,320,910. Based on the foregoing computation, the district court ordered the Commission to increase rates to produce an additional $26,320,000 in revenues to offset attrition and inflation so that South Central Bell might realize an overall rate of return of 8.7%.
In the instant case, the Commission elected to use an historical test year (1975) and the average rate base for that year in fixing rates under which South Central Bell would operate for some time in the future. The use of an historical test year assumes that the actual results for the same period of operations will be sufficiently representative of the future to provide a reliable testing vehicle for the proposed rates. New England Telephone & Telegraph Co. v. State, 113 N.H. 92, 302 A.2d 814 (1973); Note, The Use of the Future Test Year in Utility Rate-Making, 52 B.U.L.Rev. 791 (1972). However, we know that a utility's operations in the future will be at a different level from the test year. We can normally expect a utility's service requirements to grow and generally its investment, revenues and expenses can be expected to increase as the service grows. As long as investments, revenues and expenses remain in generally the same relative position as the test year, the future realized rate of return will not fall below that level which rates were fixed to produce. However, in an inflationary period where unprecedented demands for goods and services at increasing costs upset the balance among investments, revenues and expenses, the assumption that future results will approximate those of the past is not realized in fact. The result is attrition, an erosion in earning power of revenue-producing investment caused by operating expenses or plant investment, or both, increasing more rapidly than revenues. If attrition occurs, the rate of return realized in the future will be below that which the rates are designed to produce. This effect is particularly apt to occur during a period in which high cost plant investments replace obsolete assets as this tends to increase the applicable rate base at a more rapid pace than the resulting earnings.
When it is shown that, because of attrition, a utility will not earn the overall rate of return determined by the Commission to be fair, the Commission must evaluate the impact of attrition on earnings of the utility and make an appropriate allowance for it. Only if this is done can an historical test period properly be used as a basis for determining a company's future revenue requirements. Re New York Telephone Co., 12 PUR 4th 1 (N.Y.Pub.Serv.Comm.1975). Accordingly, I conclude that the district court's decision to grant an allowance to South Central Bell to offset the impact of attrition experienced since the 1975 test year was proper.
In view of this conclusion, it is now proper to consider whether the district court erred in fixing the attritional allowance at *996 $26,320,000. In deciding this issue, it should be recognized that any determination must necessarily be based upon the projection of future conditions. Accordingly, such a determination must be subjected to close scrutiny.
At the outset, I find that, since evidence of the effects of attrition actually experienced by South Central Bell since the test year was made available to the court after having also been filed with the Commission and subject to its review, this evidence was properly considered by the district court. The authority of a reviewing court in fixing an attritional allowance extends to new evidence necessary to bring the proof as nearly as reasonably possible down to the final decision. New England Telephone & Telegraph Co. v. Dept. of Public Utilities, 354 N.E.2d 860 (Mass.1976).
After reviewing the method used by the Commission in fixing the allowance for attrition, I do not agree with the Commission's conclusion that a revenue increase of only $6,714,000 was needed to offset attrition. The ten-year period used by the Commission in its analysis failed to properly consider South Central Bell's actual investment, revenues and expenses for 1976 as well as the increased rate of inflation in recent years. The Commission may not rely on predictions when actual experience is available and establishes that the predictions are substantially incorrect. Moreover, the Commission is bound to take into account drastic changes in economic circumstances. New York Telephone Co. v. Public Service Commission, 29 N.Y.2d 164, 324 N.Y.S.2d 53, 272 N.E.2d 554 (1971). For the aforesaid reasons, I find that the attritional allowance fixed by the Commission was insufficient.
On the other hand, although I approve the method used by the district court in determining the attritional allowance since it is based on the company's actual investment, revenues and expenses for 1976, I believe that the district court failed to accord sufficient weight in its computation to certain factors which tend to offset the effects of attrition, such as lower bond prices since the hearings before the Commission, the company's increased productivity, the recent upturn in the economy, and the benefits to the company of deferred income taxes and tax credits. Thus, I consider that the district court's award of $26,320,000 to offset attrition so that South Central Bell could realize 8.7% overall rate of return authorized by the Commission is too high.
However, in view of my belief that South Central Bell is entitled to earn an overall rate of return of 9.20% and taking into consideration the factors which tend to offset attrition, I conclude that the attritional allowance of $26,320,000 is appropriate under the circumstances to assure that the company will realize this increased rate of return during the present inflationary period. For this reason, I would affirm the district court's attritional allowance of $26,320,000.

RESEARCH AND DEVELOPMENT COSTS
The Commission contends that the district court erred in requiring the expensing of research and fundamental development costs paid by South Central Bell to AT&T pursuant to the License Contract Agreement. It argues that, because these funds are expended to benefit future ratepayers, they should be capitalized and recouped in the future through amortization. On the other hand, South Central Bell argues that research and development costs should be expensed in that they represent payment for services rendered for the benefit of current ratepayers, sound accounting principles dictate such treatment, and South Central Bell has consistently expensed such costs in the past which method of accounting has been accepted by the Commission in prior rate proceedings.
On July 1, 1968, South Central Bell and AT&T entered into a License Contract Agreement in which AT&T granted certain rights and agreed to furnish certain services to South Central Bell. Other operating companies of the Bell System have similar contracts with AT&T. Basically, the rights *997 and services furnished by AT&T to the companies under this agreement are (1) the right to use telephones and telephonic devices, methods and systems which are covered by patents owned or controlled by AT&T, (2) the right to receive advice and assistance in the conduct of telephone operations, (3) financial advice and assistance, and (4) the right to share in the results of research and development of the art and science of telephony. In consideration for AT&T's performance of these services, each operating company agreed to pay annually 2½% of the company's gross earnings computed in conformity with the Uniform System of Accounts prescribed by the Federal Communications Commission. On the same date as the contract (July 1, 1968), a letter was addressed to South Central Bell by AT&T in which AT&T agreed to accept until further notice as payment for its services under the contract 1% of the total gross earnings. Thereafter, on June 3, 1974, a similar letter was addressed to South Central Bell by AT&T informing South Central Bell that effective October 1, 1974 and continuing thereafter until further notice AT&T would require an amount equal to South Central Bell's allocated share of the total costs associated with providing services under the contract, but not to exceed the rate of 2½ of gross earnings. There is evidence in the record that, pursuant to this agreement, South Central Bell pays about 5% of the total license service costs with the share of its Louisiana operation comprising about one-fifth of that amount.
The task of research and fundamental development is performed by Bell Telephone Laboratories, which is owned equally by AT&T and Western Electric Company (a wholly-owned subsidiary of AT&T). According to Mr. W. R. Meredith, Jr., general revenue supervisor for South Central Bell, experience has demonstrated that it is more efficient and economical to perform work involving common needs and problems of the Bell companies on a centralized basis conducted by the Bell Labs. Mr. James H. Brenneman, manager of license and regulatory matters of AT&T, testified that research and development is not product-oriented; rather, its primary purpose is to develop innovative techniques resulting in more efficient operations of the Bell System companies. In other words, the efforts of Bell Labs are geared to assisting the operating companies in solving their day-to-day problems. He further indicated that, when the efforts of Bell Labs reach a point that they can be identified with a specific product, the funding of the product by AT&T ceases and thereupon is assumed by Western Electric. Brenneman also testified that, according to accepted accounting principles and a formal opinion by the Financial Accounting Standards Board, costs attributable to research and fundamental development are expensed rather than capitalized.
Although the Commission expressed reservations about any assessment under the License Contract in excess of 1% of revenues, it did not disallow the amount of the license service costs but rather elected to adjust only the costs attributable to research and fundamental development by requiring that they be capitalized and amortized over a future period. This ruling was contrary to expert testimony in the record that accepted accounting principles would treat such costs as an expense item.
After reviewing the Commission's order, the district court found no reasonable basis to support the Commission's decision to capitalize these costs and thus concluded that the Commission had abused its discretion in disallowing the expensing of these costs. The court ordered the Commission to make the necessary adjustments to conform with its ruling.
Based upon the evidence in the record, I believe that the costs of research and fundamental development are properly treated for rate-making purposes as an operating expense. There is no implication that the License Contract Agreement was entered in bad faith. Nor is there any dispute that the services rendered by AT&T under the contract were beneficial to South Central Bell and more than justified the payments made by the company to AT&T. The costs are clearly expended to enable South Central Bell to provide its current ratepayers *998 with efficient and economic telephone service and are expensed and allocated to the operating companies in the year in which they are incurred. Moreover, the expensing of these costs conforms with generally accepted accounting principles as enunciated by the Financial Accounting Standards Board. Furthermore, in two recent utility decisions, research and development costs were found to be a proper and appropriate expense item for rate-making purposes. Re The Chesapeake & Potomac Telephone Co., ___ P.U.R.4th___ (Order No. 62319, Public Service Commission of Maryland, May 5, 1977); Re Ohio Bell Telephone Co., 15 P.U. R.4th 344 (Ohio Pub.Util.Comm.1976). Accordingly, I find that the district court did not err in ordering that the costs attributable to research and fundamental development be treated as an operating expense.

SEPARATIONS
South Central Bell contends that the Commission erred in ordering an allocation or "separation" of investment and expenses of the Federal Telecommunications System (FTS) between interstate and intrastate jurisdictions. The company argues that all of FTS investment and expenses should be included in the intrastate rate base and expenses; whereas, the Commission contends that the adjustment of the company's rate base and expenses to exclude that portion of FTS investment and expenses attributable to interstate operations is based on a proper interpretation of the Separations Manual and is fair to Louisiana ratepayers.
It should be noted at the outset that the procedure employed to allocate investment and expenses between interstate and intrastate operations is set forth in the Separations Manual developed by the NARUCFCC Cooperative Committee on Communications. As stated in the manual, the fundamental basis on which separations are made is the use of telephone plant in each of the operations.
The method prescribed in the manual by which to apportion plant and expenses to interstate operations is the subscriber plant factor. This factor is developed by the use of a two-part formula, the first of which is expressed as a ratio of interstate minutes of use to total minutes of use and is known as the subscriber line use factor. The subscriber line use (interstate ratio or percentage of use) is multiplied by 3.39 to determine the subscriber plant factor. The 3.39 is a factor used to recognize the deterrent effect of usage sensitive pricing of long-distance service.
In the instant case, South Central Bell, relying upon its interpretation of the Separations Manual, included in its intrastate rate base all of the investment of the common control switching arrangement (CCSA), a system of switched private lines, a portion of which is composed of the FTS. The FTS is a dedicated network of switching equipment and connecting lines serving federal offices and installations around the United States. FTS traffic involves both interstate and intrastate uses. The allocation of CCSA investment entirely to South Central Bell's intrastate rate base was accomplished by the company's excluding CCSA interstate minutes of use from the numerator of the subscriber line use factor while including CCSA total minutes of use in the denominator of the ratio. The company maintained that this exclusion of CCSA interstate minutes of use from the subscriber line use factor was necessitated by the lack of data with which to compute its actual interstate minutes of use.
The Commission disagreed with South Central Bell's method of applying the Separations Manual. The company's exclusion of CCSA interstate minutes of use from the formula resulted in an over-allocation of plant and expenses to the company's intrastate operations. In absence of exact data, the Commission estimated the interstate minutes of use.
In computing this estimate, the Commission noted that one of South Central Bell's 176 exchanges was devoted exclusively to handling CCSA traffic for the federal government. It assumed that each exchange produced 100 minutes of use or a total of 17,600 minutes of use. The Commission *999 found from the record that the interstate use (subscriber line use) of these exchanges was 4.51% of the total use. Therefore, 793.76 minutes of use were interstate (.0451 X 17,600). Since one exchange exclusively handled CCSA traffic for the federal government (interstate use), all of the exchange's minutes of use (100) were included in the interstate rate. Thus, the adjusted numerator of the subscriber line use ratio was 893.76 (793.76 + 100); the denominator (total use) was 17,600; the result was 5.08% (subscriber line use or interstate percentage of use). As previously indicated, subscriber line use is multiplied by 3.39 in order to determine the subscriber plant factor. Therefore, the Commission proceeded to multiply 5.08% (subscriber line use) by 3.30 [11] which resulted in 17.2212% (subscriber plant factor). South Central Bell had relied on a subscriber plant factor of 15.2890% which resulted in an over-allocation to intrastate plant and expenses by the use of this factor. The over-allocation was 1.9322% (17.2212% - 15.2890%). Since the average net plant (including both intrastate and interstate) was approximately 1.055 billion dollars, the Commission estimated that 50% of this amount (527.5 million dollars) was allocated to intrastate operations. Applying the aforesaid over-allocation of 1.9322%, the net intrastate plant as reported by South Central Bell was overstated by $10,192,000 (.019322 X $527,500,000). Therefore, the Commission reduced South Central Bell's intrastate rate base by this amount. The record also indicates that the net operating income for the 1975 test year was adjusted in the amount of $1,813,000 to reflect the appropriate separations. The district court approved the actions of the Commission on this issue.
After review of the evidence in the record, the findings of the Commission and the arguments of counsel, I would reject South Central Bell's contention that the Commission erred in ordering an allocation of investment and expenses of the Federal Telecommunications System between interstate and intrastate jurisdictions. The Commission's decision was proper and appropriate under the circumstances. Re The Chesapeake & Potomac Telephone Co., 4 P.U. R.4th 1 (D.C.Pub.Serv.Comm.1974). Moreover, I do not consider that the Commission erred in the manner in which the allocation was accomplished. It represented a perfectly reasonable interpretation of the Separations Manual. Finally, I do not find that the apportionment ordered by the Commission will deprive South Central Bell of a return on that portion of its FTS investment allotted to its interstate operations since it may seek an appropriate adjustment of its interstate rates from either the Federal-State Joint Board or Federal Communications Commission.
Accordingly, I respectfully dissent.
NOTES
[1] While the proposed rate increase was under consideration, South Central Bell filed a petition for injunction and mandamus in the district court. By this action, the company sought to require a decision by the Commission on its application before April 18, 1976, and the establishment of interim rates pending a final determination. The district court rendered judgment in favor of South Central Bell, ordering the Commission to render its decision by April 18, 1976, and, in default thereof, to implement the proposed rate increase under bond.

Acting on an application filed by the Commission, this Court issued an order to stay the execution of the district court judgment and also issued a writ of certiorari to review the correctness of the ruling. After review, this Court ordered the Commission to render a decision within thirty days. However, this Court concluded that the trial judge was without authority to order the interim rate increase. South Central Bell Telephone Company v. Louisiana Public Service Commission, 334 So.2d 189 (La.1976).
[2] The following discussion is not directly applicable to the more complex problem presented by the instant case involving a wholly owned subsidiary affiliated with three national corporations which together with other subsidiaries conduct both intrastate and interstate operations which are regulated by a host of state and federal agencies. See, Jones, supra, at 881-83; see discussion of capital structure, infra.
[3] "If, upon the trial of any suit brought to contest any decision, act, rule, rate, charge, classification, or order, of the commission, the plaintiff introduces evidence which is found to be different from that offered upon the hearing before the commission, or additional thereto, the court, before proceeding to render judgment, unless the parties to such action stipulate in writing to the contrary, shall send a transcript of such evidence to the commission, and stay proceedings in the suit for fifteen days from the date of such transmission. Upon the receipt of the transcript, the commission shall consider the evidence, and it may alter, modify, amend, or rescind its decision, act, rule, rate, charge, classification, or order, complained of in the suit and shall report its action to the court within fifteen days from the receipt of the transcript."
[4] NARUC-FCC Cooperative Committee on Communications, Separations Manual, ¶ 11.22(3)(d) (1971).
[5] This approximation was derived by a method improvised by the Commission because of the lack of any data showing the actual amount of time used by FTS in interstate communications. See discussion, infra, pp. 43-4.
[1] South Central Bell Telephone Co. v. La. Public Service Commission, No. 190,040 (19th Jud. Dist.Ct., Division B, April 8, 1976).
[2] 329 So.2d 683 (La.1976).
[3] 334 So.2d 189 (La.1976).
[4] Order No. U-12785, as reported at 15 P.U.R. 4th 87.
[5] See also La.R.S. 45:1192.
[6] South Central Bell Telephone Co. v. La. Public Service Commission, No. 193,946 (19th Jud. Dist.Ct., July 23, 1976).
[7] 340 So.2d 1300 (La.1976).
[8] Order No. U-12785-A. In computing the amount of the appropriate adjustments for the district court, the Louisiana Public Service Commission reserved its right to appeal the substantive determinations of the district court that any attrition allowance was necessary and that capitalization of research and development costs paid to AT&T was improper.
[9] La.Const. art. 4, § 21(E) (1974).
[10] Accord, New England Telephone & Telegraph Co. v. Department of Public Utilities, 360 Mass. 443, 275 N.E.2d 493 (1971). In that case the utility, unlike South Central Bell, had minority shareholders. However, I do not find that this factual distinction has any significant bearing on the right of a regulated company to have its own cost of debt used in computing its overall rate of return rather than that of its parent corporation.
[11] The Commission was of the opinion that the use of FTS is subject to a deterrent factor (3.39) because of the extra costs of installing additional special lines as use increases.